504 S.E.2d 324

**The STATE, Respondent,**

v.

**Brenda Gail CUTRO, Appellant.**

**No. 24834.**

Supreme Court of South Carolina.

Heard Sept. 18, 1997.
Decided Aug. 31, 1998.
Rehearing Denied Sept. 25, 1998.

Thomas M. Neal, III, H. Wesley Kirkland, Jr., and S.C. Office of Appellate Defense, Columbia; and L. Lisa McPherson, Lexington, for appellant.

Attorney General Charles Molony Condon, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General William Edgar Salter, III, Solicitor Warren B. Giese, and Deputy Solicitor Jonathan S. Gasser, Columbia, for respondent.

MOORE, Justice:

Appellant Brenda Gail Cutro was convicted of one count of murder and sentenced to life imprisonment. We reverse.

## FACTS

In 1993, appellant and her husband operated a day care center in their home. During that year, two infants died while in their care. A third child was diagnosed with Shaken Baby Syndrome. Appellant was convicted of murder for the September 1993 death of four-month-old Ashlan Daniel. The death of Parker Colson in January 1993 and the June 1993 diagnosis of Asher Maier with Shaken Baby Syndrome were admitted into evidence as prior bad acts at appellant's trial.[1]

## ISSUE

Did the trial judge err in admitting evidence of Parker's death and Asher's diagnosis of Shaken Baby Syndrome which the state offered to prove common scheme or plan pursuant to *State v. Lyle*?[2]

## DISCUSSION

Appellant contends the trial judge erred in admitting *Lyle* evidence.[3] We agree. The State offered evidence of two

---

1.  After an autopsy, Parker's death initially was attributed to pneumonia. This was subsequently changed to SIDS by the pathologist who had performed the autopsy after she consulted an expert on SIDS. Ashlan's cause of death was listed as "undetermined/presumed SIDS." Ashlan's autopsy was performed by a different doctor and with the knowledge of Parker's death and Asher's injury and the suspicions surrounding appellant and her husband. SIDS is a diagnosis by exclusion (i.e. no cause of death can be ascertained). The bodies of the babies were exhumed in July 1994 and the State's experts determined the babies had died from asphyxiation as a result of trauma. The doctors who had performed the original autopsies did not change their opinions as to the cause of the deaths. Further, several defense experts also testified the children did not die as a result of trauma.

2.  125 S.C. 406, 118 S.E. 803 (1923).

3.  Contrary to the dissent's assertions, appellant properly raised this issue on appeal. In her brief, appellant states that "[i]n the absence of any properly-admitted evidence that [appellant] shook each of these three (3) children, the necessary *Lyle* connection fails and the Colson/Maier evidence should not have been admitted." Appellant argues that Parker and Ashlan died from SIDS (i.e. not from trauma). Appellant's trial strategy was to prove that Parker and Ashlan died from SIDS. In doing so, she implicitly argued she did not commit any bad act. There could be no other way to view this argument. As for Asher,

alleged prior bad acts: 1) Parker's death which occurred eight months before Ashlan's death and while he was in appellant's care on January 4, 1993; and 2) the diagnosis of Asher with Shaken Baby Syndrome three months prior to Ashlan's death on June 23, 1993. Prior to trial, the trial judge held a hearing on the admissibility of this evidence. He ruled that he would let the State introduce the evidence and if the State was unable to tie the evidence together he would grant a mistrial. After the State concluded its case, the trial judge found the evidence admissible and held that the State had presented clear and convincing evidence, albeit circumstantial, that appellant had committed these other offenses.

In the case of the common scheme or plan exception under *Lyle,* a close degree of similarity or connection between the prior bad act and the crime for which the defendant is on trial is necessary. *State v. Parker,* 315 S.C. 230, 433 S.E.2d 831 (1993). *See also State v. Douglas,* 302 S.C. 508, 397 S.E.2d 98 (1990). The connection between the prior bad act and the crime must be more than just a general similarity. *State v. Stokes,* 279 S.C. 191, 304 S.E.2d 814 (1983). A common scheme or plan concerns more than the commission of two similar crimes; some connection between the crimes is necessary. *Id.*

Evidence of other crimes must be put to a rather severe test before admission. The acid test of admissibility is the logical relevancy of the other crimes. The trial judge must clearly perceive the connection between the other crimes and the crimes charged. *Lyle, supra.* Further, other crimes which are not the subject of conviction must be proven by clear and convincing evidence. *State v. Pierce,* 326 S.C. 176, 485 S.E.2d 913 (1997).

In *Pierce,* we held the trial court erred in admitting prior bad act evidence of child abuse because the State had failed to offer clear and convincing proof that the appellant had inflicted the prior injuries. Similarly, in *State v. Smith,* 300 S.C. 216, 387 S.E.2d 245 (1989), we held proof appellant committed a prior murder was not clear and convincing.

_____

appellant does not dispute that the child was shaken—she contends, however, that she did not do it.

Likewise, here, the evidence is insufficient to establish that appellant was the actor in Parker's death or Asher's injuries.[4]

Appellant and her husband testified she routinely left all of the children in her husband's care while she ran errands. In fact, on the day Parker died, they testified appellant's husband provided almost all of their care. On that day, appellant left the house for over two hours to go to the bank, grocery store, a crafts store, and Wal-mart. Appellant's husband was holding Parker when she returned and he put Parker down for his nap. Appellant's husband found Parker not breathing an hour later.

The experts seem to agree that Asher's injuries occurred sometime within the seventy-two-hour-period prior to when he was taken to the hospital. Further, because he was not dehydrated, it was ascertained that the injury probably occurred within the prior twenty-four hours.[5] Asher was taken to the hospital on the morning of Wednesday, June 23rd. Appellant and another parent testified Asher appeared sick when his mother, Catherine Maier, dropped him off at approximately 7:30 a.m. Appellant called Catherine that morning around 10:30 a.m. and asked her to take him to the doctor. Appellant's husband immediately carried Asher, who was already strapped into his car seat, out to the car when Catherine arrived to take him to the doctor at approximately 11:30 a.m.

---

4. The dissent blatantly concludes the "SIDS diagnosis was in error" even though the highly qualified medical experts who testified in this trial could not agree this was the case. Unlike the dissent, we find it unnecessary to summarize the testimony of the numerous medical experts. We base our opinion upon the lack of evidence presented that appellant was the perpetrator, if there was one.

We note, however, the dissent misleadingly states Dr. Daniel, who had originally performed the autopsy on Parker, testified that her findings were consistent with forced asphyxiation. Dr. Daniels testified her findings were consistent with forced asphyxiation *and SIDS.* She testified she made her final decision by determining that it was more likely than not that this was a SIDS death.

5. Dr. Louis Becton testified Asher was not dehydrated and after he had been shaken he would have immediately lost his motor skills and been unable to eat. He also testified it takes an infant hours, rather than days, to become dehydrated.

Several persons other than appellant, including Catherine and appellant's husband, had access to Asher within this preceding twenty-four hour period. We think the evidence is insufficient to establish that appellant injured Asher.

The dissent states "[Appellant] had *nearly* exclusive control over Asher and Parker; the only other person with clear access to Asher and Parker was [appellant's] husband." (emphasis added). This view of the evidence does not support the conclusion that appellant was the sole person who could have inflicted the injuries. The dissent points to appellant's testimony that Parker was her responsibility and it was her job to give him back to his mother that day. This testimony does not somehow exclude appellant's husband from being the perpetrator. The dissent states appellant's credibility was in doubt at trial. Even if we discount appellant's testimony because of her lack of credibility, there is still appellant's husband's testimony that he helped care for the children. More importantly, the State did not present any evidence to the contrary. Thus, the only evidence on this issue is that appellant did *not* have exclusive control of the children.

The facts of this case are very similar to the facts in *State v. Conyers*, 268 S.C. 276, 233 S.E.2d 95 (1977). In *Conyers*, the appellant was convicted of murdering her second husband by poisoning him with arsenic. The State introduced evidence regarding the poisoning of appellant's son-in-law, mother-in-law, first husband, and a potential business partner. The Court summarily concluded the trial judge properly admitted evidence of poisoning of the son-in-law, mother-in-law, and potential business partner. However, the Court held the trial court had erred in admitting evidence of the poisoning of appellant's ex-husband. Appellant's first husband died six years before her second husband. The first husband's body was exhumed and it was found to contain the highest level of arsenic of any of the other victims. "There was very little evidence, however, to establish that appellant poisoned her first husband other than the fact that she was his wife and he had some life insurance. This evidence alone was insufficient to establish the identity of appellant as the actor in poisoning her first husband." 268 S.C. at 281, 233 S.E.2d at 96.[6] The

6. Contrary to the dissent's assertions, the *Conyers* opinion, which summarily affirms the admission of some *Lyle* evidence without any analy-

Court held the admission of this evidence was clearly prejudicial and reversed.

Likewise, here, the evidence is insufficient to establish that appellant was the actor in Parker's death or Asher's injuries and we hold the trial judge erred in admitting this evidence. Accordingly, we reverse.

Appellant's remaining issues are affirmed pursuant to Rule 220(b)(2) and the following authorities: Issue 2: *State v. Dinkins,* 319 S.C. 415, 462 S.E.2d 59 (1995).[7] Issue 3: *State v. Washington,* 315 S.C. 108, 432 S.E.2d 448 (1993) (appellant cannot on appeal complain about the admission of evidence which she elicited). Issue 4: *State v. Williams,* 303 S.C. 274, 400 S.E.2d 131 (1991) (in ruling on a motion for a directed verdict, the trial judge is concerned with the existence or nonexistence of evidence, not its weight). Issue 5: *State v. Bailey,* 276 S.C. 32, 274 S.E.2d 913 (1981) (admission of evidence is within the trial court's discretion and absent an abuse of this discretion will not be reversed by this Court); *State v. Schmidt,* 288 S.C. 301, 342 S.E.2d 401 (1986) (evidence is relevant if it tends to establish or make more or less probable some matter at issue upon which it directly or indirectly bears); *State v. Sullivan,* 277 S.C. 35, 282 S.E.2d 838 (1981) (appellant cannot complain of prejudice from admission of evidence if he opened the door to its admission).

**REVERSED.**

FINNEY, C.J., and WALLER, J., concur.

TOAL and BURNETT, JJ., dissenting in separate opinion.

TOAL, Justice:

The majority affirms all issues, except the question of Cutro's prior bad acts. It finds that the trial court erred in admitting, under *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923), evidence of the death of Parker Colson and the injury

---

sis or discussion, provides no support for the admission of the *Lyle* evidence in this case. Furthermore, the *Conyers* decision is not the only precedent upon which we base our decision in this case.

**7.** Based solely upon the grounds which appellant raised, we affirm the admission of the statistics.

of Asher Maier. Because this finding fails procedurally and substantively, I must dissent from this portion of the majority's opinion.

## A. PROCEDURAL GROUNDS

The majority opinion holds that evidence of Brenda Cutro's prior bad acts is inadmissible because the State failed to prove her commission of these acts by clear and convincing evidence. This argument is procedurally barred inasmuch as it was neither raised, nor argued, on appeal by Cutro. Before this Court, Cutro contests the trial court's ruling concerning the *Lyle* evidence on two distinct bases: (1) the State has not established a sufficient connection for the prior bad acts to be admissible because of dissimilarities between the prior bad acts and the current murder; and (2) even if the evidence were admissible, the State has introduced too much evidence, thereby prejudicing Cutro.

Cutro does not argue that the State failed to prove the prior bad acts by clear and convincing evidence. This issue has been raised by the majority *sua sponte*. Because this ground is procedurally barred, it is improper for this Court to consider it. *See State v. Sullivan*, 277 S.C. 35, 282 S.E.2d 838 (1981) (An issue not argued in the appellant's brief is deemed abandoned.). The impropriety of reaching this issue is compounded by the fact that the parties have not had the opportunity to adequately brief this issue. This is particularly necessary in a case like this one, a complex two-week trial that involved a parade of over eighty witnesses, a collection of over one hundred sixty exhibits, and a record exceeding three thousand pages.

In footnote 3 of its opinion, the majority attempts to rebut our position that its argument is procedurally barred. It posits, in a very generalized fashion, the argument that somehow the issue is before this Court. In claiming that Cutro has properly presented the issue that the State has failed to prove by clear and convincing evidence that she committed the prior bad acts, the majority has not—and cannot—cite to a single paragraph of the argument contained in Cutro's brief to support its position.[1] A perusal of the eleven-page *Lyle*

---

1. The majority refers to the following statement: "In the absence of any properly-admitted evidence that Mrs. Cutro shook each of these three

argument contained in Cutro's brief will demonstrate beyond peradventure that this issue is procedurally barred. Even an examination of Cutro's argument headings suffices to convince that the argument is not appellant's, but rather a *sua sponte* product of the majority's analysis. As an aid to the reader, we quote these argument headings:

I.   The trial judge improperly allowed the State to introduce evidence concerning the death of Parker Colson and the injury to Asher Maier.

A.   There was doubt as to the connection between the death of Ashlan Daniel (the charge for which Appellant was tried) and the death of Parker Colson and the injury to Asher Maier.

B.   If any such evidence was admissible, the State introduced too much evidence and effectively tried the Appellant on all three (3) charges.

*See* Appellant's Brief, pp. 16–26.

The arguments that were presented by Cutro's brief are as follows: Where an alleged bad act is strikingly similar to the one for which a defendant is being tried, the danger of prejudice is enhanced; this is particularly true in a case resting upon circumstantial evidence. The case against Cutro was purely circumstantial in nature. *See* Appellant's Brief,

---

(3) children, the necessary *Lyle* connection fails and the Colson/Maier evidence should not have been admitted." This reference further reinforces our argument that Cutro has not specifically raised the issue of the State failing to prove the prior bad acts by clear and convincing evidence. First, the statement is very general in nature and does not identify the precise issue which the majority chooses to address. Second, it does not even appear in Cutro's statement of issues on appeal, nor in the argument portion of Cutro's brief. Instead, the above-quoted sentence is a passing reference in an introductory note in Cutro's brief.

It is well established that ordinarily no point will be considered which is not set forth in the statement of issues on appeal. Rule 207(b)(1)(B), SCACR; *Gamble v. International Paper Realty Corp.*, 323 S.C. 367, 474 S.E.2d 438 (1996). Further, a one-sentence argument is too conclusory to present any issue on appeal. *Englert, Inc. v. Netherlands Ins. Co.*, 315 S.C. 300, 433 S.E.2d 871 (Ct.App.1993). The majority cannot overcome these procedural hurdles. We may search in vain Cutro's brief for the issue of the State failing to prove the prior bad acts by clear and convincing evidence. Ultimately, neither Cutro's statement of issues, nor a single full paragraph of her argument will yield the issue.

pp. 16–17. Further, the State did not prove the bad acts were similar. *See* Appellant's Brief, pp. 20–22. Finally, if the evidence were admissible, the State introduced too much of it. *See* Appellant's Brief, pp. 22–26.

It is most revealing that the argument created for Cutro by the majority even contradicts, at the most basic level, one of the very arguments she did make: The majority champions the cause that the State did not present enough evidence. Contrarily, Cutro's brief contends that the State presented too much evidence. This discrepancy alone should alert us to the procedural mischief afoot.

Thus, because Cutro has never presented the argument lying at the center of the majority's conclusion, the matter should be considered procedurally barred.

## B. SUBSTANTIVE GROUNDS

Even if we assume the issue has been properly presented on appeal, it fails on the merits. The majority opinion concludes that there was not clear and convincing evidence that Cutro caused Parker's death and Asher's injuries. The record is otherwise.

Cutro operated a day care center in her home in Irmo, South Carolina. During an eight month period in 1993, three children in Cutro's care either died or were severely injured. In January 1993, Parker Colson died while in Cutro's care; in June 1993, Asher Maier suffered severe brain damage while in Cutro's care; in September 1993, Ashlan Daniel died while in Cutro's care. Cutro was eventually indicted for the murder of Ashlan. The State sought to introduce, under *Lyle*, evidence of Parker's death and Asher's injuries in order to show motive, a common scheme or plan, and identity. There were a number of similarities between the three cases:

1.  all three children were in the custody, care, and control of Cutro;

2.  all three children were between four and five months old;

3.  all the events occurred at Cutro's house;

4.  all the events occurred during daytime;

5.  all three children died as a result of physical abuse (suffocation or shaking);

6.  all three children suffered injuries to the brain area;

7.  the deaths and injury were all inconsistent with Sudden Infant Death Syndrome [SIDS];

8.  all three children had insignificant medical histories;

9.  all the children were born after normal, full-term pregnancies; and

10.  there was absence of evidence that the injuries were caused by accident.

The trial court admitted the evidence of the prior bad acts, finding this to be a "textbook" *Lyle* situation. The court further found that the probative value of the evidence outweighed its prejudicial effect. Moreover, it concluded that, in this circumstantial evidence case, the State had proved the prior bad acts with clear and convincing evidence.

The admission of evidence in a criminal prosecution is within the discretion of the trial court, and its ruling will not be disturbed on appeal unless an abuse of discretion is shown. *State v. Wright,* 322 S.C. 253, 471 S.E.2d 700 (1996). A review of the record reveals there is ample evidence to uphold the trial court's ruling that the prior bad acts were proven by clear and convincing evidence.

### 1.  PARKER COLSON

Parker was a healthy baby in the days preceding January 4, 1993. He was perfectly fine when he was dropped off at Cutro's day care center on January 4th. In the middle of the day, his mother received a call from the day care center and was told that Parker was not breathing. Emergency medical personnel were called to Cutro's home where they found that the infant's heart was not beating. They were told upon their arrival that Parker had been found on the bed not breathing and that he had been checked 10 or 15 minutes earlier and was okay. They attempted to resuscitate Parker, but were unsuccessful. Parker was transported to the hospital where for 20 minutes the emergency room physician attempted to resuscitate him. The physician also failed. Parker was declared dead at 2:55 p.m.

On January 5th, Dr. Beverly Williams–Daniel, a pathologist at the Lexington Medical Center, performed an autopsy on Parker. She did not discover any external signs of trauma to Parker's body. Based on collections of cells found in Parker's lungs, she originally listed his cause of death as acute bronchopneumonia bilateral. After getting more information from Parker's parents, Dr. Daniel felt that she may have misdiagnosed the cause of death. She consulted another pathologist who advised that Parker did not die from pneumonia. Because she did not have another cause of death, Dr. Daniel amended the report to list SIDS as the cause.

Dr. Enid Gilbert–Barness, a professor of pediatrics and pathology and a hospital director of pediatric pathology, examined the evidence related to Parker's death. At the time, Dr. Barness had over 40 years of experience in pediatric pathology, having performed in excess of 4,000 autopsies. After reviewing the autopsy reports and the pathological specimens, she was alarmed to find the presence of petechial hemorrhages in Parker's brain. In her 40 years of practicing pediatric pathology, she had never observed gross (i.e. visible to the naked eye) petechial hemorrhaging in the brain of an infant diagnosed with SIDS. She testified that Parker died of trauma, which was very likely caused by shaking, resulting in a subdural hemorrhage and petechial hemorrhages in the brain.

Dr. John Emery, a forensic pediatric pathologist, also testified for the State. In Dr. Emery's 45 years of experience, he had performed autopsies on over 6,000 infants. After reviewing the evidence, Dr. Emery concluded that the cells in Parker's lungs were not connected with his death. Misdiagnosis based on this symptom occurs when pathologists do not have experience performing autopsies on infants. Dr. Emery found petechiae in Parker's brain in a distribution that was "quite different" than in control studies. The petechiae were increased to a level of clinical significance. He was convinced that there was blood in the dura before the child had died. It was his opinion that Parker had died as a result of trauma.

Dr. Janice Ophoven similarly testified. As a pediatric forensic pathologist, she had had over 23 years of experience; the last 18 of those years had been primarily focussed on

infant autopsies. She reviewed the microscopic slides of Parker's major organs, photographs of body parts after exhumation, as well as his complete medical history and other medical information. After reviewing the information, she concluded that Parker did not die naturally. She observed petechial hemorrhages in the brain that were visible to the naked eye. This is a sign of asphyxia. In all her years of experience, Dr. Ophoven had never observed gross petechial hemorrhages in infants who had died of SIDS. Nor had she ever seen a scientific journal describing a case of SIDS involving grossly visible petechial hemorrhages. Based on this finding, and also the presence of subdural blood, she concluded that Parker had died of non-accidental trauma or child abuse.

Dr. Ophoven also had the opportunity to review the autopsies of every South Carolina infant who had died in the period January 1, 1993 to June 14, 1994 and whose cause of death had been listed as SIDS. After reviewing 102 autopsies from 31 counties, she found that of all the infants in these cases, only two had suffered hemorrhaging in the brain, detectable grossly and microscopically. These two infants were Parker Colson and Ashlan Daniel, the child Cutro was found guilty of murdering in the instant case.

### 2. ASHER MAIER

Asher was dropped off at Cutro's home on June 23, 1993 at 7:30 a.m. At 10:30 a.m., Cutro called Asher's mother, asking her to take him to the doctor because he would not eat or sleep and kept crying. Asher's mother arrived soon thereafter and took Asher to the doctor.

Dr. Lewis Becton, who examined Asher, testified that when Asher was brought into the hospital, he was pale and irritable, had very poor neck control, could not focus, and was obviously not neurologically normal. His neck was completely limp, and he had retinal hemorrhaging. Asher was diagnosed as suffering from shaken baby syndrome. Dr. Becton testified that Asher's condition was such that he could not suck or take food. Such symptoms occur immediately after a baby has been shaken. Because Asher was not dehydrated, he must have had food within the previous 24 hours. Thus, the shaking of Asher must have occurred in this 24 hour period.

The last time Asher had been seen to be normal was when he was dropped off at Cutro's day care. A parent who went by the day care center that morning testified that he saw Asher holding his head up and turning around. Cutro herself had given a statement about the events of June 23rd. In her statement, she said that Asher was dropped off at the day care center by her mother. Cutro indicated that Asher was not fully alert that morning. She made no mention that Asher exhibited any highly unusual symptoms, such as a limp neck.

Dr. Randall Alexander, a nationally recognized expert in the field of pediatrics and child abuse, testified that his examination of the evidence revealed that Asher had suffered from at least two episodes of violent shaking. This conclusion was based on both medical and historical evidence. C.T. scans and M.R.I. scans showed that Asher had sustained considerable head trauma. Moreover, he had had retinal hemorrhaging, which appears in up to 90 percent of shaken baby syndrome cases. The symptoms of shaking appear shortly after the abuse. Accordingly, Dr. Alexander concluded to a reasonable degree of medical certainty that the second shaking episode must have occurred between 7:30 a.m. and 11:30 a.m. on June 23rd—between the time Asher was dropped off at Cutro's and the time he was presented at Dr. Weston's office.

Dr. Wilbur Smith, Jr. also testified. As an expert in pediatric radiology and child abuse, he was, at the time of the trial, one of only 30 or fewer physicians in the country who were exam-certified in the field. He stated that because of the evidence of the retinal hemorrhages, the subdural hematomas, and subarachnoid hemorrhages, "there is no question [that] there is no other medical diagnosis" than shaken baby syndrome. Sufficient tests, he declared, were done to rule out any other cause. Based on the eyewitness evidence of how Asher was acting when he was dropped off, Dr. Smith concluded that Asher must have been shaken on June 23rd, sometime between 7:30 a.m. and when he was taken to the doctor's office.

The above evidence, which is uncontested, clearly and convincingly shows that Asher was normal when he was dropped off. When he emerged after a few hours in Cutro's care, he exhibited the signs of shaken baby syndrome.

### 3. PROPER ADMISSION OF EVIDENCE BY TRIAL JUDGE

Cutro argues, and the majority agrees, that there was conflicting evidence concerning the proof of the prior bad acts. Although I would concur that the evidence was not uncontradicted (as it rarely is in a criminal case), I find that the weight of evidence establishing Cutro's abuse of Parker and Asher is simply overwhelming. The State presented significant, but not excessive, evidence to establish a close degree of similarity or connection between all of Cutro's bad acts.

The majority implicitly suggests that SIDS, not trauma, was the real cause of Parker's death. This argument fails on numerous grounds. First, the opinion does not specify exactly what this evidence is. My reading of the record leads me to conclude that evidence of SIDS was minimal, in comparison to the mountain of evidence presented that abuse was the cause of death. The convincing testimony of highly-qualified experts has been described in detail above.

Second, even if Cutro's defense witnesses presented some evidence of SIDS, the persuasiveness of this evidence was essentially nullified by the same witnesses' candid and compelling arguments in favor of the State's position. Cutro's own expert, Dr. Sandra Conradi, remarkably testified that she "was very suspicious of homicide." She further said on the stand that she did not recall, in her years of experience, ever seeing grossly or microscopically petechial hemorrhages in a SIDS case. Dr. James Reynolds, who also testified on behalf of Cutro, stated that in his 23 years of experience, he had never seen petechial hemorrhages in the brain of a SIDS infant. Finally, Dr. John Pless, another of Cutro's expert witnesses, declared that in his opinion, Asher Maier was shaken.

Third, Cutro has failed to rebut the evidence presented by the State as to why Parker's death may have initially been misdiagnosed as SIDS. Dr. Daniel, who had labeled Parker's death as SIDS (after changing it from pneumonia), testified that there were three major factors which did not make this a SIDS case: (1) it was uncommon for SIDS deaths to occur in the middle of the day; they are much more common during the night; (2) she did not find any petechial hemorrhages in the intrathoracic area, which is commonly found in SIDS

cases; and (3) she found petechiae in the brain, which she had never seen occur in a SIDS case. She indicated that her findings were consistent with forced asphyxiation.

Furthermore, Dr. Barness testified that the initial pathologist failed to take certain steps during the autopsy. If these steps—including the removal and examination of the eyes and the removal of the dura—had been taken, they would have assisted in making an accurate diagnosis. This was further confirmed by Dr. Ophoven who stated that in order to observe any type of hemorrhage or trauma to the eyes, the pathologist has to remove the eyes. At the initial autopsy, the eyes were not removed. Nor was the dura stripped. For these reasons, the SIDS diagnosis was in error. The initial misdiagnosis is understandable given that the autopsy was conducted by a general pathologist and not by one with specific training or expertise in performing infant autopsies. In contrast, the experts presented by the State had decades of experience in the fields of pediatric pathology, pediatric forensic pathology, and pediatric radiology, and had performed autopsies on thousands of infants.

The majority asserts there was insufficient evidence Cutro injured Asher or Parker. While the State obviously did not have direct evidence of these bad acts, it presented an overwhelming amount of circumstantial evidence. Cutro had nearly exclusive control [2] over Asher and Parker; the only other

2. The majority criticizes the statement that Cutro had "nearly exclusive control" over Asher and Parker. Instead, it posits that Cutro did not have "exclusive control" over the children and that this view of the evidence does not support the conclusion that she was "the sole person who could have inflicted the injuries" on them. The majority does not cite any authority for the proposition that in order to meet a clear and convincing standard of proof, the State must establish that the defendant had "exclusive control" over the victims. It appears that the majority is elevating the proof requirement to unprecedented, and unrealistic, levels. If "exclusive control" had to be established every time a *Lyle* issue arose, it would be difficult to imagine a circumstance where any evidence of prior bad acts would be admissible.

For example, suppose that a serial killer had murdered 50 blue-eyed, blond-haired twenty-year-old girls alongside South Carolina highways. A distinctive word, written out by the killer, was found on the forearms of all these victims. Under the majority's formulation of the *Lyle* rule, if a defendant were tried for one of the murders, evidence of the 49 other murders would not be admissible because, regardless of the

person with clear access to Asher and Parker was Cutro's husband. She herself testified that Parker "was my responsibility. It was my job to give him back to his mother that day." These children were dropped off in the morning at Cutro's. When they were picked up, they were already injured. Two expert witnesses testified that Asher's injuries occurred between 7:30 a.m. and when Asher was picked up (at approximately 11:30 a.m.). To further confirm that Cutro was the person taking care of Asher, we can look to the very affidavit Cutro gave about the incidences of that day, an affidavit given prior to her being charged in this case. She describes how Asher was feeling the day he was injured, details how she cared for him that day, and states how she called Asher's mother to inform her that Asher was not well. Nowhere in the affidavit is there any mention of anyone else having contact with Asher.

The majority now asserts that Cutro routinely left the children with her husband to run errands and that she was even gone for hours on the day of Parker's death. The majority bases these assertions on Cutro's testimony. The reliability of this information turns, therefore, on Cutro's credibility, a matter which was clearly before the judge. There was much evidence presented to call Cutro's credibility into doubt. At trial, it became evident that on a sworn affidavit related to the present incidences, Cutro had made a material misrepresentation. On cross-examination, she testified that she had no explanation why she had lied on the affidavit. Additionally, at trial, she testified that she had no contact with Parker on the day he died. This, however, contradicted the deposition testimony she had previously given, where she stated that she had played and fed Parker and had changed his diaper on that day. Because there was

amount of evidence tying the defendant to these signature crimes, the State could not demonstrate that the defendant had "exclusive control" over his victims. Because thousands of people, namely those who travel on the same highways, would have had the opportunity to commit the crimes, the defendant would not have had "exclusive control" over the victims; thus, the evidence of the previous crimes would be inadmissible. The absurdity of such a conclusion demonstrates that the majority opinion has formulated a standard that raises the level of proof to such unintended heights that it effectually abolishes the use of *Lyle* evidence in South Carolina trials.

conflicting evidence at trial whether Cutro was present and what kind of contact she had with the children, the matter of her credibility assumes great significance. The trial judge, not this Court, is in the best position to be the arbiter of her credibility.[3]

In ruling on the admission of evidence of a prior bad act, the trial court must find that the bad act has been established by clear and convincing evidence. On appeal, we are to ascertain whether the trial court abused its discretion in admitting the evidence. *See State v. Tucker,* 319 S.C. 425, 462 S.E.2d 263 (1995) (The admission of evidence is within the trial court's discretion and absent an abuse of this discretion, will not be reversed by this Court.), *cert. denied,* 516 U.S. 1080, 116 S.Ct. 789, 133 L.Ed.2d 739 (1996). Our task is not to engage in a de novo review of the evidence. Nor are we to usurp the authority of the trial court by attempting to judge the credibility of witnesses. The determination of credibility must be left to the trial judge who saw and heard the witnesses and is therefore in a better position to evaluate their veracity. *Cf. State v. Martin,* 278 S.C. 427, 298 S.E.2d 87 (1982); *State v. Rosier,* 312 S.C. 145, 439 S.E.2d 307 (Ct.App.1993).

Although there may have been some conflicts in the evidence presented in this case, the trial court had the opportunity, over the span of the two-week proceeding, to evaluate the evidence, to hear lay witnesses, to weigh the credibility of expert witnesses, to assess their varying professional credentials, to appraise the extent of their experience, and to attempt to resolve discrepancies in their testimony in ascertaining whether the prior bad acts were proven by clear and convincing evidence. The trial court carried out this task. In fact, the judge's application of this standard is explicitly enunciated in the record. He states that although at a certain point in

---

**3.** The majority states that even if Cutro's testimony is discounted because of her lack of credibility, there still remains the testimony of Cutro's husband. This argument would be persuasive were it not for the fact that the credibility of Mr. Cutro was as bad, if not worse, than that of his wife. For example, at the trial, it was revealed that Mr. Cutro had falsified significant information on his federal tax returns. He had affirmatively misrepresented the number of children he had. On his tax from, he had fabricated and listed the names of two "children" in order to be able to claim them as additional dependents. Again, the issue of his credibility was before the trial court.

the trial he was not sure whether the clear and convincing standard had been satisfied, after he heard the testimony of the State's several experts, including Dr. Barness, he concluded that the evidence was clear and convincing. He says, in reference to Dr. Barness, that she was "very clear and very convincing." He further remarks: "I don't know that I've ever heard a witness state her opinion in a stronger fashion that she did."

Because I believe the trial court is clearly in a superior position to assess the evidence first-hand and to judge the credibility of the witnesses, on appeal, we must defer to its determination whether the clear and convincing standard has been met. As with any evidentiary ruling, this finding should be reversed only if the trial judge abused its discretion. The majority opinion suggests a different standard. It implicitly proposes that this Court review the evidence de novo. Not only would this improperly encroach upon the authority of the trial court, but it would also force this Court to engage in determinations of evidentiary questions without the benefit of seeing, hearing, or assessing the witnesses. I would adhere to our traditional path, rather than to traverse this new and dangerously tortuous route.

If the above reasons were not sufficient, then certainly the very case cited by the majority should alert us to the proper course. The majority opinion cites *State v. Conyers,* 268 S.C. 276, 233 S.E.2d 95 (1977) in support of its argument that there is insufficient evidence to establish the defendant was the actor in the prior bad acts. I whole-heartedly agree with the majority that *Conyers* controls. However, *Conyers* does not suggest reversal of the present case, but rather compels its affirmance.

In *Conyers,* the defendant was tried for the poisoning of her husband. At trial, the State introduced, under *Lyle,* evidence of the alleged poisoning of Conyers's first husband, son-in-law, mother-in-law, and a business acquaintance. Conyers was convicted. She appealed her conviction, contesting the admission of the evidence of the other poisonings. She argued, in part, that these other bad acts had not been proven by clear and convincing evidence. This Court accepted her argument that evidence of the poisoning of her first husband was

inadmissible; however, we held that evidence of the other three prior bad acts had properly been admitted. Because *Conyers* is a case in which some *Lyle* evidence was deemed sufficient and properly admitted, while other *Lyle* evidence was deemed insufficient and inadmissible, it provides an ideal vehicle for testing the sufficiency of the evidence in the instant case. To determine whether evidence of Cutro's prior bad acts should have been admitted, we must compare it with not only the evidence rejected in *Conyers*, but also the evidence found sufficient in *Conyers*.

In *Conyers*, we held that the evidence of the poisoning of Conyers's first husband was inadmissible because there was very little to connect Conyers to the poisoning. The only evidence the State offered in connection with this poisoning was that Conyers's husband had died six years earlier, that she had a life insurance policy on him, and that after the husband's body was exhumed and tested, it was found to contain high levels of arsenic. We concluded that this evidence was simply insufficient to establish the identity of Conyers as the person who poisoned her husband.

By contrast, we held that the trial court had properly admitted evidence of the poisonings of Conyers's son-in-law, mother-in-law, and a business acquaintance. Although the facts are not set out in the *Conyers* opinion itself, a review of the record reveals the following evidence in relation to these prior bad acts:

(a) son-in-law: Conyers's son-in-law and his wife lived with Conyers. The son-in-law became ill one day after supper. It was discovered months later that he had been poisoned with arsenic. The son-in-law ate meals with his wife and Conyers, and although Conyers generally did the cooking, the wife did cook on occasion. The son-in-law and the wife had had marital difficulties, having both admitted to one another their infidelity. The son-in-law testified that he did not know who had poisoned him. Both the wife and Conyers denied having given the son-in-law arsenic. The wife, in many ways, had just as much opportunity as Conyers to poison the son-in-law. We found evidence of this prior bad act to be admissible.

(b) mother-in-law: Conyers visited her mother-in-law three or four times per week. On each visit, Conyers would fix

coffee for her mother-in-law. The mother-in-law's health had been good up to the time of these visits, but it deteriorated, and she died thereafter. A doctor testified that the mother-in-law had died of natural causes, but she had ingested arsenic at some point at least one to three months prior to her death. Examination of the mother-in-law's brain, kidney, and liver did not reveal unusual levels of arsenic; however, her nails and hair contained higher than normal levels. We found evidence of this prior bad act to be admissible.

(c) business acquaintance: Conyers visited an acquaintance a number of times and would usually prepare coffee for her. The acquaintance became ill shortly after the visits commenced. Tests conducted on the acquaintance revealed higher than normal arsenic levels. The acquaintance did not know she had been poisoned, did not attribute her symptoms to any coffee she had drunk, and knew no motive for Conyers to poison her. We found evidence of this prior bad act to be admissible.

In *Conyers*, we declared that we were "convinced" the trial judge had properly admitted evidence of the poisonings of the son-in-law, the mother-in-law, and the acquaintance. *Conyers*, 268 S.C. at 281, 233 S.E.2d at 96 (1977). As the above factual descriptions suggest, in *Conyers*, we assumed a rather deferential approach to the findings of the trial court in relation to *Lyle* evidence.

It is clear that the facts of the present case are well within the limits set out in *Conyers*. In fact, the evidence in the present case is orders of magnitude weightier than that which was upheld in *Conyers*. There is simply no comparison between the evidence presented of Cutro's abuse of Parker and Asher and the prior bad acts deemed admissible in *Conyers*, namely, the poisonings of the son-in-law, the mother-in-law, and the acquaintance. *Conyers* teaches that on appeal, this Court will reverse only when the trial judge has clearly abused its discretion (as was the case with the evidence about Conyers's first husband).[4] There is more than ample support

---

4. The majority's opinion criticizes our discussion of *Conyers*, suggesting that *Conyers* summarily affirmed the admission of some *Lyle* evidence, without "any" analysis or discussion. Although the discussion in *Conyers* is terse, it is nevertheless present, an analysis which invites us

to uphold the trial court's admission of evidence of Cutro's prior bad acts. The majority cannot show that the trial court abused its discretion. Accordingly, I must dissent. I would affirm the conviction.

BURNETT, J., concurs.

---

to review the record: "[A]fter *a careful review of the testimony,* we are convinced that the trial judge properly admitted evidence of the poisoning of Bazen [son-in-law], Louise Conyers [mother-in-law], and Iris Stevens [business acquaintance]...." *Conyers,* 268 S.C. at 281, 233 S.E.2d at 96 (emphasis added).