664 S.E.2d 480

**The STATE, Respondent,**

v.

**Henry FLETCHER, Petitioner.**

**No. 26527.**

Supreme Court of South Carolina.

Heard Feb. 20, 2008.

Decided Aug. 4, 2008.

Rehearing Denied Aug. 22, 2008.

18

Susan Barber Hackett, of Columbia, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Attorney General Norman Mark Rapoport, and Solicitor Warren Blair Giese, of Columbia, for Respondent.

20

Justice WALLER:

We granted a writ of certiorari to review the Court of Appeals' opinion in *State v. Fletcher*, 363 S.C. 221, 609 S.E.2d 572 (2005). We reverse.

## FACTS

Petitioner, Henry Fletcher, was indicted for homicide by child abuse relating to the death of nine-month-old Jaquan Perry. Jaquan was the son of Fletcher's live-in girlfriend, Ikeisha Perry. On the afternoon of September 21, 2000, Perry and Fletcher transported Jaquan to Palmetto Richland Memorial Hospital at approximately 1:15 p.m. According to Perry and Fletcher, the child had been fine that morning, so they took him on errands and to his brother's dental appointment. As they were leaving the dentist office, Fletcher noticed the soft spot on Jaquan's head was not moving so Perry checked and could not find a heart beat. Neither Fletcher nor Perry had noticed anything wrong with him prior to this time. However, both Fletcher and Perry told police Jaquan had fallen off a mattress onto a hardwood floor that morning. Although he seemed sleepy, they thought he was otherwise okay.

Dr. Robert Hubbird, the Pediatric ICU physician who first saw Jaquan at the hospital, testified that when he first saw him, Jaquan was in full cardiopulmonary arrest, his heart was not beating, and he was not breathing. Jaquan was resuscitated several times but was ultimately pronounced dead at 4:20 p.m. Dr. Hubbird testified Jaquan's abdomen was severely distended and protuberant, and that both his liver and bowel were injured. The bowel was injured so severely that it was leaking out into the abdomen and perineal cavity. According to Dr. Hubbird, both the liver and bowel were dying; the fact that he could not hear any bowel sounds meant they had been like that for days. Dr. Hubbird testified that Jaquan's injuries were not consistent with the reports given by Perry and Fletcher, and that the injuries would have taken an extreme amount of force directly to the abdomen. Dr Hubbird opined that the injuries would not have happened from falling a few feet from a bed onto a hardwood floor. Dr. Hubbird also testified that Jaquan had multiple rib fractures

and there were numerous bruises on his body, ranging in date from 1–10 days old. The cause of Jaquan's death was child abuse from massive intra-abdominal injuries, massive injuries to kill the bowel, and widespread infection which killed the liver.

Dr. Timothy P. Close, a radiologist, also testified to the injuries to Jaquan's liver, bowels, kidneys, spleen, and that there were fractured ribs. Close testified there were numerous rib fractures, and that they were not all suffered at the same time, which was evident from the bruising, swelling, and different shading of the bones as they attempted to heal themselves. Close felt the newest fractures were anywhere from several hours to 2–3 days old, whereas some of the older ones were more likely 10–14 days old. Dr. Close likened the injuries suffered by Jaquan to injuries suffered in an auto accident where a person has been ejected at 60–70 miles per hour.

At trial, over the objection of defense counsel, the state called Carlos Jenkins, a friend and co-worker of Fletcher, as a witness to two events he had seen in the month prior to Jaquan's death. The attorneys for both Perry and Fletcher objected, contending there was not clear and convincing evidence as to who committed those acts, nor were those acts causally related to Jaquan's death. The trial court ruled that the "the course and conduct within a reasonable time before [Jaquan] died" was admissible. The Court also ruled it was a *res gestae* type situation. Accordingly, Jenkins was permitted to testify.

Jenkins testified he had known Fletcher for 4–5 years and had known Perry for only a couple of months. Over counsels' renewed objections, Jenkins testified that approximately two weeks prior to Jaquan's death, he had gone to Fletcher's house (where Perry and her two children were also living) and heard the baby crying. Fletcher told him the baby was upstairs, so he walked upstairs and found Jaquan sitting in a walker in the attic, "pouring down sweat like he had just dipped him in a bathtub." Jenkins testified he took Jaquan outside on the porch and cooled him off. Both Fletcher and Perry were home at the time.

Jenkins also testified that sometime in the two or three weeks prior to the attic incident, he came to the house and found Jaquan handcuffed by his feet to the bed on which Fletcher and Perry slept, so he unlocked the cuffs. Both Perry and Fletcher were home at the time. When Jenkins asked them if they were crazy, they just giggled.

Perry did not testify at trial. She did, however, give several statements to police, which were admitted in redacted form at trial. In her statements, Perry also indicated Jaquan had fallen from the bed the morning of September 21st. She comforted him, and then sat him on the sofa beside Fletcher. She and Fletcher brought Jaquan with them to run errands and, as they left the dentist's office, she realized his heart was not beating and drove to the emergency room while Fletcher attempted CPR. Perry denied ever beating Jaquan, but admitted Jaquan had been handcuffed to the bottom of the bed in her room.

Fletcher gave several statements to police and testified at trial. In his statements to police, he indicated similarly to Perry that Jaquan had rolled off a mattress in the morning, but was unharmed so they took him along on errands. He noticed Jaquan's soft spot on his head wasn't moving when they left the dentist's office and discovered he didn't appear to be breathing. They drove to the hospital while Fletcher attempted CPR, striking him in the chest a few times.

Fletcher denied ever beating Jaquan, but testified that Perry had done so a few times. He testified he had not seen Perry handcuff Jaquan to the bed, but saw him that way after he got out of the shower. He also testified that the "attic" where Perry would sometimes bring the children and hang clothes to dry was not actually an attic, but an unfinished room off of a bedroom on the second level of the house. According to Fletcher, there was an air duct right outside the "attic," one step outside from the stairs. He testified he had never put Jaquan in the attic.

Fletcher testified that he was not at the house on Sycamore Avenue from the Sunday until the Wednesday evening before Jaquan's death, arriving at 11:00 p.m. that Wednesday. (Jaquan died on Thursday). According to Fletcher, on the day of Jaquan's death, after he fell out of bed, Jaquan kept trying to

go to sleep, so he was tapping/hitting Jaquan on the bottom of his feet to keep him awake.

The jury convicted Fletcher of homicide by child abuse. On appeal, the Court of Appeals affirmed, holding, *inter alia,* the prior bad acts testified to by Jenkins were properly admitted pursuant to Rule 404(b), SCRE, and *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923). It held the prior bad acts had been proved by clear and convincing evidence, and that the acts were admissible to demonstrate a) a common scheme or plan of child abuse or neglect, b) intent or the absence of mistake or accident, c) as part of the res gestae of crime of homicide by child abuse and d) that, in any event, any error in admission of Jenkins' testimony was harmless beyond a reasonable doubt given the overwhelming evidence of guilt in this case.

## ISSUES

Did the Court of Appeals err in holding Jenkins' testimony concerning the events he witnessed in the weeks prior to Jaquan's death were admissible under Rule 404(b), SCRE and that admission of this evidence was, in any event, harmless error?

## DISCUSSION

 Under Rule 404(b), SCRE, evidence of other crimes, wrongs, or acts is generally not admissible to prove the defendant's guilt for the crime charged. Such evidence is, however, admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent. *State v. Pagan,* 369 S.C. 201, 631 S.E.2d 262 (2006); *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923). To be admissible, the bad act must logically relate to the crime with which the defendant has been charged. If the defendant was not convicted of the prior crime, evidence of the prior bad act must be clear and convincing. *Id.; State v. Beck,* 342 S.C. 129, 135–36, 536 S.E.2d 679, 682–83 (2000). Even if prior bad act evidence is clear and convincing and falls within an exception, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Rules 403 and 404(b), SCRE (although relevant, evidence may be excluded if its probative value is substantially outweighed

by the danger of unfair prejudice); *State v. Gillian*, 373 S.C. 601, 646 S.E.2d 872 (2007); *State v. Braxton*, 343 S.C. 629, 541 S.E.2d 833 (2001). The determination of the prejudicial effect of the evidence must be based on the entire record and the result will generally turn on the facts of each case. *State v. Bell*, 302 S.C. 18, 393 S.E.2d 364, *cert. denied*, 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1990).

■ The Court of Appeals stated, without discussion, "The evidence demonstrates by clear and convincing proof the occurrence of the prior bad acts." This was error.[1] The present record does not contain clear and convincing evidence that Fletcher was the person who put Jaquan in the attic, nor does it indicate he was the person who handcuffed her to the bed.

■ Clear and convincing evidence is that degree of proof which will produce in the mind of the trier of facts a firm belief as to the allegations sought to be established. Such proof is intermediate, more than a mere preponderance but less than is required for proof beyond a reasonable doubt; it does not mean clear and unequivocal. *Peeler v. Spartan Radiocasting, Inc.*, 324 S.C. 261, 478 S.E.2d 282, 283 n. 4 (1996).

Here, there is simply not clear and convincing evidence in the record that Fletcher committed the prior bad acts testified to by Jenkins. Although Jenkins testified he saw Jaquan handcuffed to the bed and in the walker in the attic, there was no evidence whatsoever introduced at trial that Fletcher was either the person who placed Jaquan in the attic, or that he handcuffed him to the bed. On the contrary, Fletcher testified that upon discovering Perry had handcuffed Jaquan to the bed, he cussed her out about it after Jenkins left. Additionally, there was no testimony Fletcher was the person who put

1. We are not persuaded by the state's contention that this issue is not preserved for review. During a lengthy pre-trial hearing on the matter, both counsel for Perry and Fletcher argued against admission of Jenkins' testimony. Later, immediately prior to Jenkins' testimony, counsel for Perry objected, raising numerous grounds, including "the evidence relating to the rib injuries should not come in because there was not clear and convincing evidence as to who inflicted these rib injuries.... The same with the handcuffs and with the attic incident ..." We find the issue is sufficiently preserved for our review.

Jaquan in the attic room, and he testified Perry sometimes put him there while she dried her clothes as she used it as a laundry room.

We have previously found a lack of clear and convincing evidence the defendant committed the prior bad act in question where, for example, there was no evidence the appellant had committed the prior injuries of a split lip and a swollen eye because the state offered no proof the appellant inflicted the injuries. *State v. Pierce*, 326 S.C. 176, 485 S.E.2d 913 (1997) (evidence of prior child abuse inadmissible where there was no evidence defendant inflicted previous injury). *See also State v. Cutro*, 332 S.C. 100, 504 S.E.2d 324 (evidence of prior infant deaths inadmissible where there was lack of evidence defendant was the perpetrator).

On the present evidence, there is simply no evidence, let alone clear and convincing evidence that Fletcher was the perpetrator of the prior bad acts [2] against Jaquan. Accordingly, the trial court erred in admitting Jenkins' testimony.[3]

■ Finally, the Court of Appeals held that even if admission of Jenkins' testimony was improper, any error was harmless in light of the overwhelming evidence of guilt in this case. This holding was error.

■■ Error is harmless beyond a reasonable doubt where it did not contribute to the verdict obtained. *Arnold v. State*, 309 S.C. 157, 172, 420 S.E.2d 834, 842 (1992). An insubstantial error not affecting the result of the trial is harmless where "guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached." *State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989).

There was little evidence at trial as to who inflicted Jaquan's injuries. Although Fletcher gave a statement to police

---

**2.** We need not decide whether these acts, if proven by clear and convincing evidence, would otherwise be admissible under Rule 404(b), SCRE.

**3.** Further, contrary to the trial court's ruling, the prior acts simply do not come within the *res gestae* under the facts of this case *Accord State v. Bolden*, 303 S.C. 41, 398 S.E.2d 494 (1990). (prior acts must be so intimately connected to the crimes charged that their introduction is appropriate to complete the story of the crime charged).

in which he admitted to wrestling with Jaquan, and hitting him with his elbows, and ultimately to punching him, he explained this at trial both by claiming he was being sarcastic after hours of questioning, and was utilizing the police officer's definition of "hitting" in describing his wrestling with Jaquan. Accordingly, given that the identity of the perpetrator was the essential issue at trial, and given the dearth of evidence in the record, we simply cannot say that error in the admission of Jenkins' testimony was harmless beyond a reasonable doubt.

This case fundamentally demonstrates why certain prior bad act testimony is inadmissible, i.e., it is used by the jury to infer that the defendant did in fact commit the crime for which he is on trial. We find the only function of Jenkins' testimony in this case was to demonstrate Fletcher's bad character. Accordingly, admission of this testimony was both erroneous and prejudicial.[1] The Court of Appeals' opinion is reversed.

**REVERSED.**

MOORE, PLEICONES, JJ., and Acting Justice J. MICHELLE CHILDS, concur. TOAL, C.J., dissenting in a separate opinion.

Chief Justice TOAL:

I respectfully dissent. In my view, the trial court properly admitted the prior bad acts at issue. Accordingly, I would affirm Petitioner's conviction and sentence.

Although evidence of other crimes, wrongs, or acts is not admissible for purposes of proving that the defendant possesses a criminal character or has a propensity to commit the charged crime, such evidence may be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent. Rule 404(b), SCRE. To be admissible, a prior bad act must logically relate to the crime with which the defendant has been charged. *State v. Pagan,* 369 S.C. 201, 211, 631 S.E.2d 262, 267 (2006).

4. The dissent would hold the evidence is admissible to establish a pattern of child abuse and neglect, such that it is relevant to the charge of homicide by child abuse. The majority of this Court, however, has specifically rejected an identical contention under similar facts. *State v. Pierce,* 326 S.C. 176, 485 S.E.2d 913 (1997).

If the defendant was not convicted of the prior crime, evidence of the prior bad act must be clear and convincing. *Id.* Prior bad acts may also be admissible under the *res gestae* doctrine. Under this doctrine, evidence of prior bad acts may be admissible where such evidence constitutes an integral part of the crime with which the defendant is charged or is needed to aid the fact finder in understanding the context in which the crime occurred. *State v. King,* 334 S.C. 504, 512, 514 S.E.2d 578, 582 (1999).

Child abuse differs from other types of crimes in several respects. Specifically, the crime of child abuse often occurs in secret, typically in the privacy of one's home. The abusive conduct is not usually confined to a single instance, but rather is a systematic pattern of violence progressively escalating and worsening over time. Child victims are often completely dependent upon the abuser, unable to defend themselves, and often too young to alert anyone to their horrendous plight or ask for help. It is also not uncommon for child abuse victims to be so young that they are incapable of offering testimony against the abuser. For these reasons, proving the crime of child abuse is extremely difficult.

In light of the insidious nature of this crime, our Legislature created a separate homicide statute related to child abuse. That statute provides that "[a] person is guilty of homicide by child abuse if the person: causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life." S.C.Code Ann. § 16–3–85(A)(1) (2006). The Legislature has defined "child abuse or neglect" as "an act or omission by any person which causes harm to the child's physical health or welfare." S.C.Code Ann. § 16–3–85(B)(1) (2006). Thus, the homicide by child abuse statute criminalizes the specific infliction of abuse as well as the failure to protect a child from abuse which results in the death of that child while exhibiting an extreme indifference to human life. In this way, the statute incorporates more than just the act that causes the death—it criminalizes the course of conduct which results in the death of a child. In my view, this statute is grounded in the public policy that an adult is not only prohibited from physically abusing a child, but also is

prohibited from deliberately sitting by and allowing a child's life to be threatened by the abuse of another.

In my opinion, the majority's view of the prior bad acts in the instant case as it relates to the crime of homicide by child abuse is far too narrow. Because the statute specifically prohibits not just acts resulting in death to a child, but also omissions, I believe that it is irrelevant whether Petitioner was the one to actually handcuff the infant victim to the bed and to place him in the attic, or whether he was aware of the abusive incidents that occurred in his home and failed to act to protect the child from the abuse. Pursuant to the statute, the jury was free to return a guilty verdict if it found that Petitioner failed to act in the face of patently dangerous conditions in which the victim was placed.

The evidence at trial showed that Petitioner and the infant victim's mother began a relationship in March 2000. In August 2000, several weeks prior to the victim's death, the victim's mother along with the victim and her other child began living at Petitioner's house with Petitioner. Although Petitioner testified that he did not spend every night at the house, he testified that he observed the victim's mother beat the victim and saw her wrap the victim in a blanket and get on top of him. Petitioner admitted that he would "play fight" with the victim, and in his statement to police, he stated that he had hit the victim several times with his elbow and twice with his fists, pinched him, and put his weight on him, but that he did not mean to hurt the victim.[5]

The State presented evidence that the infant victim suffered severe internal injuries, multiple rib fractures, ruptured bowels which caused infection and sepsis, internal bleeding, abdominal infections, and dying organs, all of which ultimately culminated in his death. Doctors testified that these injuries occurred at different times and that the newer fractures were between several hours to three days old, while the older fractures were likely two weeks old. Additionally, doctors testified that the victim's injuries resulted from multiple and

---

5. At trial, the police officer testified that Petitioner had shown him how he placed his weight on the victim, which the officer demonstrated to the jury. The officer also testified that Petitioner weighed approximately 220 pounds at the time of his arrest, and another witness described Petitioner as "really, really big."

repeated blows and were not consistent with a single blow. The record contains no evidence that the victim died accidentally, and I believe that the extensive evidence of repeated brutal physical abuse leads only to the conclusion that the victim died an agonizing, prolonged death by torture at the hands of an adult. Petitioner's friend's testimony showed, at a minimum, that Petitioner deliberately failed to come to the victim's aid while the victim was living in Petitioner home and that Petitioner exhibited extreme indifference to human life, resulting in harm to the victim's safety and welfare.[6] Thus, under statute, this evidence was clearly relevant to Petitioner's guilt of the crime of homicide by child abuse.

Considering the evidence presented in this case, I would hold that the friend's testimony was admissible under the *res gestae* doctrine. I believe that the testimony showed a course of conduct and established an integral part of the crime of homicide by child abuse because it is evidence that Petitioner abused and neglected the victim just weeks before his death. In light of the temporal proximity to victim's death and considering the nature of child abuse, I believe that Petitioner's friend's testimony was necessary to a full presentation of the crime. *See State v. Adams,* 322 S.C. 114, 122, 470 S.E.2d 366, 370 (1996) (quoting *United States v. Masters,* 622 F.2d 83, 86 (4th Cir.1980)) (holding that evidence of prior bad acts is admissible under the *res gestae* doctrine where such evidence "furnishes part of the context of the crime or is necessary to a full presentation of the case.").

I would also hold that the testimony was admissible pursuant to Rule 404(b) to show a common scheme or plan, because I believe that the prior bad acts bore a close degree of similarity and were sufficiently connected to the victim's death. In my view, Petitioner's friend's testimony was evidence of a pattern of abuse towards the victim shortly before his death in Petitioner's own home. These acts were committed against the same victim, close in time to the victim's death,

---

**6.** I reach this conclusion viewing the prior bad act in the light most favorable to Petitioner, for there is evidence in the record that Petitioner himself committed the acts of abuse. Specifically, the record includes testimony that the handcuffs were Petitioner's; that Petitioner giggled after the friend removed the handcuffs; and that Petitioner told the friend "to mind his own business."

and showed escalating abuse over a narrow and specific time period. In this way, this case is distinguishable from other cases in which we have found prior bad act evidence inadmissible under 404(b) as a common scheme or plan. *See State v. Smith,* 322 S.C. 107, 110, 470 S.E.2d 364, 366 (1996) (holding prior bad acts against girlfriends son would not have been admissible in defendants trial for the death of girlfriends daughter where there was no evidence defendant previously abused the daughter and where the prior acts of abuse were not sufficiently similar); *State v. Pierce,* 326 S.C. 176, 179, 485 S.E.2d 913, 914 (1997) (holding evidence of prior bad act was inadmissible under the common scheme or plan exception where the acts were not sufficiently similar and where the acts occurred more than a year apart).[7]

Furthermore, I would hold that this evidence is admissible pursuant to Rule 404(b) to prove intent and absence of mistake or accident. In order to prove its case, the State was required to prove that Petitioner exhibited an extreme indifference to human life. In my view, these prior bad acts showed that Petitioner exhibited extreme and deliberate indifference and conscious disregard towards the victim's life just weeks prior to his death. *See State v. McKnight,* 352 S.C. 635, 645, 576 S.E.2d 168, 173 (2003) (noting that in reckless homicide cases, reckless disregard for the safety of others signifies an indifference to the consequences of one's acts or a conscious indifference to the safety of others); *State v. Jarrell,* 350 S.C. 90, 97, 564 S.E.2d 362, 366 (Ct.App.2002) (holding that "in the context of homicide by abuse statutes, extreme indifference is a mental state akin to intent characterized by a deliberate act culminating in death."). Moreover, I believe that this testimony is evidence that the victim's death was not

---

7. In my view, the majority in *Pierce* did not hold that prior bad acts are never admissible to establish a pattern of child abuse, but rather, that testimony from medical personnel regarding injuries to the child was inadmissible to show a pattern of child abuse because there was no evidence the defendant committed the abuse causing the injuries. Additionally, the majority held that evidence of the defendant's "rough treatment" of the child a year prior to his death did not bear a close similarity or connection. Contrary to the testimony sought to be admitted in *Pierce,* Petitioner's friend's testimony provides an eyewitness account of the manner in which Petitioner treated Jacquan shortly before his death.

the result of the victim accidentally falling off of the bed, as Petitioner claimed. *See State v. Smith,* 337 S.C. 27, 33, 522 S.E.2d 598, 601 (1999) (holding that the trial court properly admitted the defendants previous domestic violence convictions to show intent and absence of mistake or accident where he claimed the shooting was an accident).

In the homicide by child abuse statute, the Legislature drafted a criminal offense that recognizes and criminalizes both the acts and the omissions that typify the situation in which a helpless child perishes as a result of an adult's actions or criminal ambivalence. In my view, this evidence was not admitted as character or propensity evidence. Rather, I believe that the evidence showed a common scheme or plan, absence of mistake or accident, and intent, and that it was necessary for a full presentation of the State's case. For these reasons, I would affirm Petitioner's conviction and sentence.