705 S.E.2d 491

The STATE, Respondent,

v.

Wesley SMITH, Appellant.

No. 4785.

Court of Appeals of South Carolina.

Heard Sept. 16, 2010.

Decided Jan. 26, 2011.

Rehearing Denied Feb. 28, 2011.

354

356

Appellate Defender Kathrine Haggard Hudgins, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Assistant Attorney General Christina Catoe, all of Columbia; and Solicitor John Gregory Hembree, of Conway; for Respondent.

FEW, C.J.

Wesley Smith was convicted of aiding and abetting homicide by child abuse against his four-month-old daughter, Ebony. The trial judge sentenced him to twenty years. Smith raises two primary issues on appeal. First, he claims the judge committed error in admitting evidence of a prior incident of child abuse against Ebony. He also contends the judge erred in allowing the State to proceed under the aiding and abetting section of the homicide by child abuse statute. We affirm.

## I. Facts

Ebony Kiandra Smith died on February 14, 2004, from a combination of an overdose of four times the adult therapeutic level of pseudoephedrine [1] and blunt force trauma to her chest. Her death culminated a four month saga of abuse and neglect for Ebony. Charlene Dandridge, Ebony's mother and Wesley Smith's live-in girlfriend, left Ebony at home with Smith that day while she went to work. Other than Dandridge's brief return home for lunch, the child was in Smith's sole custody the entire day. Smith was indicted for homicide by child abuse as a principal under section 16–3–85(A)(1) of the South Carolina Code (2003).

At trial, the State proved the history of Ebony's abuse. The State established through medical witnesses that Ebony had seventeen broken ribs at the time of her death. The pathologist testified that the rib fractures were "really classic for squeezing type of injury" caused by child abuse. Through a microscopic examination of each individual rib fracture, the

---

1. Pseudoephedrine is a decongestant found in over-the-counter products such as Sudafed. It is not permitted to be given to children under the age of two.

pathologist determined by the extent of healing that the fractures had occurred between ten days and three weeks before Ebony's death.[2] The pathologist also found evidence of hemorrhaging over some of the fractures indicating new injuries at the site of the fractures that occurred approximately 24 hours before Ebony's death. The doctor testified that the older fractures resulted from squeezing, but the more recent injuries could have resulted from squeezing or striking. The pathologist testified: "It's inflicted trauma. . . . [T]here's no way that this occurred accidentally or naturally, no way whatsoever."

The State proved that Smith was Ebony's primary caretaker and that he was around her on a constant basis. From January 15 until the day of her death, the only adults with access to Ebony were Smith, Dandridge, and Smith's mother and father who saw Ebony on the weekends. On the day of her death, the only people who saw Ebony were Smith, Dandridge, and Dandridge's other two young children.

Importantly, Smith did not object to the introduction of any of the evidence described so far, nor does he challenge the admission of that evidence on appeal. He did object, however, to the admission of evidence of a broken femur Ebony suffered in November, 2003. Dandridge came home from work one day in November to find that Ebony's leg was immobile. Smith, who had sole custody of Ebony that day, explained to Dandridge that he was napping with Ebony on his chest when he heard someone knock on the door. Smith explained the injury by telling Dandridge that, as he reacted to the knock, Ebony fell backwards with her leg still in Smith's hand. Smith and Dandridge apparently knew the leg was broken because Smith concocted a homemade splint and put it on Ebony's leg. They did not initially take Ebony to the doctor because Dandridge was afraid Ebony would be taken away from her. On December 9, they finally took Ebony to the doctor. The pediatrician who examined Ebony that day testified that her "thigh was very swollen and painful" and explained that Ebony "started to cry every time I touched her leg." The pediatrician asked Smith how the injury occurred.

2. A radiologist testified that X-rays taken on January 15 showed no rib fractures.

At first, Smith told the doctor he "had no idea," but he later gave her the same story he told Dandridge, admitting he was holding Ebony when the injury happened.

The doctor ordered X-rays which demonstrated a "spiral fracture" of Ebony's femur with callus showing the bone had been healing for at least two weeks. The radiologist who examined the X-rays on December 9 testified a spiral fracture is "a twisting type injury that causes the bone to fracture in a spiral rather than just a crack" and that a spiral fracture is typically not accidental. During the autopsy, the pathologist was able to examine the fractured femur in greater detail. She described the spiral fracture as one caused by "a twisting, yanking motion, and that's what we see more with abusive fractures." While showing the X-ray to the jury, she described the break of Ebony's femur as "a complete break. It's going from the inner part of the thigh down towards the outer part." She described the fracture as "abusive in that this is an inflicted fracture. This is not an accidental fracture." Finally, the pathologist testified that Smith's story about how the injury occurred is "absolutely not" consistent with the medical evidence she had just described. The trial judge admitted the evidence over Smith's objection.

At the close of all the evidence, the State asked the trial judge to charge the jury that it could find Smith guilty under both subsections of the homicide by child abuse statute. The indictment alleged he was guilty as a principal under subsection 16–3–85(A)(1). The trial judge also allowed the State to proceed under subsection 16–3–85(A)(2), the aiding and abetting subsection of the statute. The jury found Smith guilty of aiding and abetting homicide by child abuse, and the judge imposed the maximum penalty of twenty years.

## II. Other Crimes, Wrongs, or Acts

The rule of evidence governing the admissibility of other crimes, wrongs or acts committed by a defendant has long been a part of our jurisprudence. In 1923, in the often cited case of *State v. Lyle* our supreme court described it as "the familiar and salutary general rule, universally recognized and firmly established in all English-speaking countries...." 125 S.C. 406, 415–16, 118 S.E. 803, 807 (1923). The rule is based

on the danger that the jury will reach a guilty verdict because of the defendant's bad character and not based on the evidence of the crime for which he is currently on trial. This danger was described in *Lyle:*

> Proof that a defendant has been guilty of another crime equally heinous prompts to a ready acceptance of and belief in the prosecution's theory that he is guilty of the crime charged. Its effect is to predispose the mind of the juror to believe the prisoner guilty, and thus effectually to strip him of the presumption of innocence. It "compels the defendant to meet charges of which the indictment gives him no information, confuses him in his defense, raises a variety of issues, and thus diverts the attention of the jury from the one immediately before it."

125 S.C. at 416, 118 S.E. at 807 (citations omitted).

The rule is often explained in terms of "propensity," in that the rule prevents a defendant from being found guilty simply because of his propensity to commit similar crimes. "The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime." *Michelson v. United States,* 335 U.S. 469, 475, 69 S.Ct. 213, 93 L.Ed. 168 (1948). "It is in criminal cases that the law must be the most sternly on guard against allowing the doing of an act to be proved by a propensity to do it." James F. Dreher, *A Guide to Evidence Law in South Carolina* 35 (South Carolina Bar 1967). "[E]vidence of other crimes, wrongs, or acts is not admissible for purposes of proving that the defendant possesses a criminal character or has a propensity to commit the charged crime." *State v. Fletcher,* 379 S.C. 17, 26, 664 S.E.2d 480, 484 (2008) (Toal, C.J., dissenting).

When South Carolina adopted the Rules of Evidence in 1995, the law of admissibility of evidence of other crimes, wrongs and acts was incorporated into Rule 404(b). The first sentence of Rule 404(b) focuses the court's inquiry on the purpose for which the evidence is offered. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b), SCRE. When other acts of the defendant

are offered to prove his character in order to show that he acted in conformity with his character, the evidence is offered for the prohibited purpose of showing a propensity to commit the crime, and is therefore not admissible. *See Fletcher*, 379 S.C. at 26, 664 S.E.2d at 484 (explaining "why certain prior bad act testimony is inadmissible, i.e., ..." when "the only function of [the] testimony ... was to demonstrate ... bad character" which was "used by the jury to infer that the defendant did in fact commit the crime").[3]

However, Rule 404(b) recognizes exceptions to the bar against using the evidence to prove propensity. When the evidence is offered for one of the five purposes listed in the second sentence of Rule 404(b), evidence of other crimes, wrongs or acts "may ... be admissible." The five listed purposes are "to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent." Rule 404(b), SCRE.

In order to introduce evidence of some other act of the defendant under one of these exceptions, the State must lay the proper foundation. First, unless the act is the subject of a criminal conviction, the State must prove by clear and convincing evidence that the defendant committed the act. *Fletcher*, 379 S.C. at 23, 664 S.E.2d at 483.

The second element of the foundation requires the State to articulate the logical connection between the other act and at least one of the five purposes listed as exceptions in the rule. *State v. Pagan*, 369 S.C. 201, 211, 631 S.E.2d 262, 267 (2006). In order to meet this element, the State must explain how evidence of the other act will assist the judge or the jury in understanding some material issue in the case related to one or more of the Rule 404(b) exceptions. When the State adequately explains how the evidence of the other act logically connects to an issue in the case, it demonstrates how the judge or jury can use the evidence without using it for the prohibited

---

3. *Fletcher* was actually decided on the basis of the State's failure to prove the other acts by clear and convincing evidence. 379 S.C. at 25 n. 2, 664 S.E.2d at 484 n. 2 ("We need not decide whether these acts, if proven by clear and convincing evidence, would otherwise be admissible under Rule 404(b), SCRE."). The court nevertheless explained the basis for the rule excluding propensity evidence.

purpose of inferring guilt from the defendant's propensity to commit the crime. *See State v. Wiles,* 383 S.C. 151, 158, 679 S.E.2d 172, 176 (2009) ("Stated differently, evidence which is logically relevant to establish a material element of the offense charged is not to be excluded merely because it incidentally reveals the accused's guilt of another crime." (internal citations omitted)).

■ If the trial judge finds the State has met the first two elements, the judge must consider Rule 403, SCRE. *State v. Stokes,* 381 S.C. 390, 404, 673 S.E.2d 434, 441 (2009). Under Rule 403, the trial judge must determine whether the logical connection articulated by the State is sufficiently strong that the probative value found in the connection is not substantially outweighed by the tendency of the evidence to show propensity, or by some other form of unfair prejudice. If the trial judge determines not to exclude the evidence under this Rule 403 analysis, then the State may admit it.

■ Turning to the facts of this case, we are satisfied the judge acted within his discretion in ruling the evidence was clear and convincing that Smith committed child abuse in connection with Ebony's broken leg. While the record does not reflect the exact manner in which the injury occurred, the State's proof that Smith was guilty of the abuse that caused it is overwhelming. Smith was the only person with Ebony when the injury occurred. Smith admitted to Dandridge and to the pediatrician that the injury occurred while he held the child in his hands. Three treating physicians along with the pathologist testified that Ebony's spiral fracture was the result of child abuse, not accident. Moreover, the State presented evidence that Smith lied to Dandridge, the doctors, and investigators from the Department of Social Services about how the child's injury occurred in order to conceal his involvement in the injury. There is ample evidence to support the judge's ruling.

■ We review a circuit court's determination that evidence offered pursuant to Rule 404(b) is clear and convincing under the "any evidence" standard. *State v. Wilson,* 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001) (reversing the court of appeals for not applying the any evidence standard in reviewing a circuit court's determination that Rule 404(b) evidence was clear and

convincing). *See also State v. Wallace,* 384 S.C. 428, 432 n. 2, 683 S.E.2d 275, 277 n. 2 (2009) ("Bad act evidence that is not subject to a conviction must be shown by clear and convincing evidence and is reviewed under an 'any evidence' standard on appeal." (citing *Wilson,* 345 S.C. at 5–6, 545 S.E.2d at 829)). Because there is evidence to support the judge's ruling that the evidence was clear and convincing, we must affirm the trial court's ruling that the State satisfied the first element.[4]

■ The State also satisfied the second element of the foundation by explaining how the evidence logically related to two of the exceptions listed under Rule 404(b): motive and absence of mistake. *See State v. Cutro,* 332 S.C. 100, 103, 504 S.E.2d 324, 325 (1998) ("The acid test of admissibility is the logical relevancy of the other crimes. The trial judge must clearly perceive the connection between the other crimes and the crimes charged."). First, the State points to the indisputable facts that the untreated broken leg was painful and that the pain would have made Ebony cry. There is ample medical testimony in the record to support this point. Second, the State presented evidence that Smith was not able to handle being around Ebony when she was crying. Third, the State presented evidence that Smith gave Ebony medicine on the day of her death, despite the fact that she had no medical condition that warranted medication. Next, the State presented expert testimony that pseudoephedrine is often improperly used to "chemically restrain" children, meaning, as the State's forensic toxicologist and drug chemist testified, to "subdue the child so that the caregiver would not have to care for the child or tend to the child, or to quiet the child in some manner."

The State summarizes its "logical connection" argument in its brief:

The child would have been crying continually and extensively because of her injuries, beginning at the time of the first known injury—the injury to the femur—and progressing with the subsequent injuries. In light of the testimony that

---

4. Contrary to the dissent's assertion, this case is not controlled by *Fletcher.* The *Fletcher* majority states "there is simply no evidence . . . that Fletcher was the perpetrator of the prior bad acts against Jaquan." 379 S.C. at 25, 664 S.E.2d at 483–84. Because there is evidence in this case to support the trial judge's ruling, *Fletcher* is distinguishable.

Appellant could not "handle" the victim's crying, the femur injury was highly relevant to show Appellant's motive for ... attempting to "chemically restrain" the child with medicine. The femur evidence was thus critical to show that the overdose was not purely a mistake or accident.

This is precisely what our courts mean when requiring a "logical connection." The State has explained how the evidence can be used by the jury to determine motive and absence of mistake without relying on propensity. The State has proven the second element of the foundation.

Finally, we believe the trial judge's ruling not to exclude the evidence under Rule 403 was within his discretion. *See State v. Holland,* 385 S.C. 159, 171–72, 682 S.E.2d 898, 904 (Ct.App. 2009) (stating this court gives "great deference to the trial court's judgment" under Rule 403 and that the "trial court's determination should be reversed only in exceptional circumstances"). The trial judge acknowledged the unfair prejudice of the evidence, calling it "highly prejudicial, obviously." He concluded, however, that "the probative value ... clearly outweighs the prejudicial effect." Smith made no Rule 403 argument to the trial judge other than the conclusory statement: "I still think we have the filter of the 403, the prejudicial and probative value." Smith's argument on appeal is equally conclusory. Given the State's articulation of the logical relevance of the femur injury, and thus its probative value, the judge acted within his discretion in concluding the unfair prejudice in admitting the evidence did not substantially outweigh the probative value.

Smith argues that because the trial court relied on this court's opinion in *State v. Fletcher,* 363 S.C. 221, 609 S.E.2d 572 (Ct.App.2005), which was subsequently reversed by the supreme court, 379 S.C. 17, 664 S.E.2d 480 (2008), Smith's conviction must also be reversed. We disagree. The supreme court's decision in *Fletcher* was based on the State's failure to prove the prior acts by clear and convincing evidence, and therefore does not control the outcome of this appeal. 379 S.C. at 25, 664 S.E.2d at 483–84 ("[T]here is simply no evidence, let alone clear and convincing evidence that Fletcher was the perpetrator of the prior bad acts....").

 One point warrants further discussion. The trial judge made several comments as to the reasons he was admitting the evidence of Ebony's broken femur which do not fit into the analysis set out above. For example, he stated "I'm admitting it to show clearly that someone committed child abuse on this child. The jury can determine whether or not this defendant did it." To the extent this and other comments by the trial judge have been argued to indicate an improper Rule 404(b) or Rule 403 analysis, it was Smith's duty to raise those arguments before the trial judge. Because the arguments were never presented to the trial judge, they are not preserved for our review. *See State v. Russell,* 345 S.C. 128, 133–34, 546 S.E.2d 202, 205 (Ct.App.2001) (finding evidentiary argument was not preserved for review because the issue was never raised to or ruled upon by the trial judge).

### III. Aiding and Abetting under Section 16–3–85(A)(2)

 Smith contends that the trial judge erred in allowing the State to proceed on aiding and abetting homicide by child abuse under subsection 16–3–85(A)(2) of the South Carolina Code (2003). Smith was indicted as a principal under subsection 16–3–85(A)(1), not under subsection 16–3–85(A)(2). He claims he did not have notice of, and the evidence was not sufficient to support, the aiding and abetting charge. We disagree.

 Under subsection 16–3–85(A)(2), a defendant is guilty of homicide by child abuse if he "knowingly aids and abets another person to commit child abuse or neglect, and the child abuse or neglect results in the death of a child under the age of eleven." *Id.* "It is well-settled that a defendant may be convicted on a theory of accomplice liability pursuant to an indictment charging him only with the principal offense." *State v. Dickman,* 341 S.C. 293, 295, 534 S.E.2d 268, 269 (2000) (citing *State v. Leonard,* 292 S.C. 133, 136, 355 S.E.2d 270, 272 (1987)). Thus, the indictment charging Smith with homicide by child abuse as a principal was effective to put him on notice that the State may request to proceed on aiding and abetting homicide by child abuse as well.[5]

---

5. We recognize that this situation is different from *Dickman* in that here the statute contains a separate aiding and abetting subsection. Howev-

We find the State presented sufficient evidence to support various theories of Smith's guilt under the aiding and abetting section. Even if the jury found the State failed to prove beyond a reasonable doubt that Smith inflicted the fatal chest injuries, or personally administered the pseudoephedrine, they could nevertheless find him guilty of aiding and abetting if they found the State proved beyond a reasonable doubt that Smith knew about the injuries or about the pseudoephedrine but failed to seek medical care for her.

## IV. Remaining Issues on Appeal

Smith raises two other issues related to the trial judge's exclusion of evidence. Smith sought to cross-examine Dandridge with evidence that she could also have been charged with homicide by child abuse as a principal, in which case she would have faced life in prison rather than thirty years.[6] Though the trial judge initially sustained the State's objection to the evidence, he later changed his mind and correctly allowed Smith to bring Dandridge back to the stand. *See State v. Curry*, 370 S.C. 674, 678–89, 636 S.E.2d 649, 651 (Ct.App.2006) (explaining that possible sentences co-defendant witnesses face are admissible as evidence of bias). However, Smith never offered the evidence. We find no error. Smith also claims the judge erred in excluding the testimony of a psychiatrist Smith said would testify Smith has a very low I.Q. The psychiatrist was not present when the request was made, and Smith never offered the testimony into the record. The issue is not preserved for review. *See State v. Santiago*, 370 S.C. 153, 163, 634 S.E.2d 23, 29 (Ct.App.2006) (explaining that appellate court will not consider alleged error unless the record shows what the testimony would have been).

---

er, the subsection does not add any elements necessary for conviction, and therefore is governed by the same general aiding and abetting principles considered in *Dickman*.

**6.** The record reveals that Dandridge faced thirty years, but does not include the specific charges she faced. Had she been charged with homicide by child abuse as a principal, she would have faced a minimum of twenty years and a maximum of life in prison. S.C.Code Ann. § 16-3-85(C)(1) (2003).

## V. Conclusion

We find the trial judge acted within his discretion in admitting evidence of Ebony's broken femur and did not err in allowing the State to proceed under the aiding and abetting section of the homicide by child abuse statute. Regarding the other issues, Smith's claim that the trial judge erred in excluding evidence of bias fails because the judge did not exclude the evidence. Smith's argument that the judge erred in excluding evidence of his borderline intelligence is not preserved for our review.

**AFFIRMED.**

HUFF, J., concurs.

GEATHERS, J. (dissenting):

I respectfully dissent. I am deeply troubled by the abuse visited upon this infant victim that resulted in her untimely death. I believe the trial court erred, however, in allowing the introduction of improper propensity evidence. Based on our supreme court's reasoning in *State v. Fletcher*, 379 S.C. 17, 664 S.E.2d 480 (2008), I would hold the admission of evidence of the victim's fractured femur as a prior bad act amounts to reversible error. In the absence of this evidence, I would also hold the trial court should not have charged the jury with aiding and abetting homicide by child abuse.[7]

## A. Prior Bad Act

On appeal, Smith argues the trial court erred in admitting evidence of a prior injury (a fractured femur) to the victim where the evidence was not clear and convincing and its probative value was substantially outweighed by the danger of unfair prejudice. The majority finds "overwhelming" evidence Smith inflicted the victim's broken leg by committing an intentional act of child abuse. I disagree.

---

7. At the time the evidence of the broken femur was admitted, Smith was only being tried for homicide by child abuse. *See* S.C.Code Ann. § 16–3–85(A)(1) (2003). The State did not request and the trial court did not decide to charge aiding and abetting homicide by child abuse pursuant to section 16–3–85(A)(2) until the close of all evidence.

Evidence of other crimes or bad acts is not admissible to show criminal propensity to commit the crime charged or to demonstrate the bad character of the accused. Rule 404(b), SCRE; *State v. Nelson,* 331 S.C. 1, 6–7, 501 S.E.2d 716, 718–19 (1998); *State v. Lyle,* 125 S.C. 406, 415–16, 118 S.E. 803, 807 (1923). However, such evidence may be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent. Rule 404(b), SCRE. "To be admissible, the bad act must logically relate to the crime with which the defendant has been charged." *Fletcher,* 379 S.C. at 23, 664 S.E.2d at 483. "If the defendant was not convicted of the prior crime, evidence of the prior bad act must be clear and convincing." *Id.* "Even if the prior bad act evidence is clear and convincing and falls within an exception, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *Id.* (citing Rule 403, SCRE).

The admission of this prior bad act conflicts with our supreme court's holding in *Fletcher.* Specifically, evidence of the victim's broken femur was inadmissible because (1) there was no evidence, let alone clear and convincing evidence, that Smith inflicted the victim's broken femur by committing an intentional act of child abuse; (2) there was no logical connection between the broken femur and the victim's resulting death; and, (3) the probative value of the victim's broken femur was substantially outweighed by the danger of unfair prejudice pursuant to Rule 403, SCRE.

During the *Fletcher* trial, a neighbor testified that approximately two weeks prior to the victim's death, he visited Fletcher's home, heard crying, and located the victim sitting alone in the attic drenched in sweat while Fletcher and the victim's mother were home. *Id.* at 21, 664 S.E.2d at 482. The same neighbor testified that approximately one month prior to the victim's death, he came to Fletcher's house and found the victim handcuffed by his feet to the bed on which Fletcher and the victim's mother slept. *Id.* at 22, 664 S.E.2d at 482.

The *Fletcher* court held that it was improper to admit the neighbor's testimony regarding these prior bad acts where there was no evidence, let alone clear and convincing evidence, as to which caretaker perpetrated the prior bad acts. *Id.* at

25, 664 S.E.2d at 483–84. Our supreme court defined clear and convincing evidence as follows:

> Clear and convincing evidence is that degree of proof which will produce in the mind of the trier of facts a firm belief as to the allegations sought to be established. Such proof is intermediate, more than a mere preponderance but less than is required for proof beyond a reasonable doubt; it does not mean clear and unequivocal.

*Id.* at 24, 664 S.E.2d at 483. The *Fletcher* court concluded that although there was evidence the victim had been abused, there was "not clear and convincing evidence in the record *that Fletcher committed the prior bad acts* ...." (emphasis added). *Id.*

In the instant case, the record does not contain any evidence that Smith intentionally inflicted the victim's broken femur. Dr. Cooper–Merchant, an attending physician, testified Smith informed him that he had no idea how the femur injury happened. Dr. Cooper–Merchant also testified Smith later stated the victim may have sustained the broken femur when she accidentally fell from his lap as Smith stood up from his chair one day upon hearing the doorbell ring.[8] Dr. Cooper–Merchant further testified Charlene Dandridge [9] was afraid to take the victim to the hospital after the femur injury because "they might consider her a bad mother." Another attending physician, Dr. Crane, testified the femur fracture could have been anywhere between two and four weeks old when he took the victim's x-ray on December 9, 2003, and it was impossible to know exactly when or how the fracture occurred. Dr. Crane noted approximately 30% of spiral fractures are accidental, and not abusive. Dr. Rahter, a third attending physi-

---

8. To the extent the majority characterizes Smith's inconsistent explanations as Smith having "lied" to conceal his involvement in the femur injury, I believe the majority misconstrues the facts. As I read the record, medical testimony merely indicated Smith's explanations were inconsistent with the victim's resulting injury. The State did not present any testimony that Smith fabricated stories to cover up for his own involvement in the injury.

9. Dandridge was the victim's mother. She testified for the State during Smith's trial but was not tried simultaneously, and the State did not charge her with homicide by child abuse.

cian, testified it was possible Smith was not even present when the spiral fracture occurred.

During the motion *in limine* to exclude evidence of the victim's broken femur, the trial court noted "either he or his wife or both of them had to do it." It appears from the record that the trial court focused on clear and convincing evidence of a pattern of abuse inflicted upon the victim by any perpetrator, versus clear and convincing evidence of abuse inflicted by Smith. I believe this was error.

An allegation of an accident does not equate to the admission of an intentional act of child abuse for purposes of demonstrating evidence of a prior bad act. *See State v. Northcutt*, 372 S.C. 207, 218–19, 641 S.E.2d 873, 879 (2007) (reversing a death penalty conviction when the trial court admitted evidence of the victim's spiral leg fracture at age ten-weeks despite the fact that the prior injury was, by all accounts, accidental and therefore not relevant to show the nature of defendant's relationship with the victim). This is particularly true where, as is the case here, Smith did not have exclusive custody and control over the victim. *See State v. Cutro*, 332 S.C. 100, 105–06, 504 S.E.2d 324, 326–27 (1998) (holding admission of prior bad acts of child abuse was reversible error when the defendant did not have exclusive control over the children during the period when the prior bad acts occurred). Indeed, DSS was unable to determine who caused the victim's broken femur after investigating the incident, and returned the victim to her parents.

Therefore, evidence of the victim's broken femur was inadmissible as a prior bad act because the State failed to present any evidence that Smith intentionally inflicted the injury. *Compare State v. Pierce*, 326 S.C. 176, 178–79, 485 S.E.2d 913, 914 (1997) (holding hospital employees' testimony regarding victim's previous injuries was inadmissible under the common scheme or plan exception because there was no clear and convincing evidence defendant inflicted the injuries), *with State v. Martucci*, 380 S.C. 232, 241–42, 251–56, 669 S.E.2d 598, 603, 608–11 (Ct.App.2008) (permitting evidence of prior bad acts of child abuse when there was eyewitness testimony that the defendant slapped victim, taped victim's mouth shut,

and dunked victim's head in a bathtub until he choked to stop victim from crying).

The majority next contends there was a "logical connection" between the broken femur and one of the exceptions listed in Rule 404(b), specifically, evidence of motive or absence of mistake. However, the logical connection required is between the prior bad act and the crime with which the defendant has been charged. *See Fletcher,* 379 S.C. at 23, 664 S.E.2d at 483; *State v. Pagan,* 369 S.C. 201, 211, 631 S.E.2d 262, 267 (2006) ("To be admissible, the bad act must logically relate to the crime with which the defendant has been charged.").

Notably, the femur injury occurred three months before the victim's death. At the well-baby visit on February 12, 2004, two days before the victim's death, the attending physician did not note anything wrong with the victim. These facts are inconsistent with the majority's assertion that Smith "chemically restrained" the victim to keep her from crying because her leg was hurting. Moreover, the majority overlooks the fact that both Smith and Dandridge admitted to administering medication to the victim in the days prior to her death, and both parents were primary caregivers.[10] Finally, the victim's cause of death was an overdose of pseudoephedrine accompanied by blunt force trauma to her chest. In the absence of any evidence Smith intentionally inflicted the broken femur, this evidence was not in any way causally related or logically connected to the victim's death and was not necessary to prove *res gestae. See Fletcher,* 379 S.C. at 25 n. 3, 664 S.E.2d at 484 n. 3.

The majority holds the broken femur was admissible to show evidence of motive or absence of mistake. However, Smith never claimed the victim's death was a mistake. Smith's only defense during trial was that Dandridge commit-

---

**10.** Dandridge had custody of the victim the entire two days prior to the victim's death (February 12–13th, 2004), and she admitted she could not recall every time she gave the victim medicine over that two day period. Dandridge further testified she could not remember whether or not she gave the victim pseudoephedrine over that two day period. In addition, Dandridge came home for lunch around 2 p.m. on the day of the victim's death, approximately five hours before Smith called 911 to report the victim was not breathing. Finally, Dandridge testified she lied to police during her initial interview but she declined to identify the content of her misstatement.

ted the acts which resulted in the victim's death. The broken femur was not relevant to show Smith's motive to commit child abuse because there was no evidence that Smith intentionally or willfully inflicted the broken femur. *See Northcutt,* 372 S.C. at 218–19, 641 S.E.2d at 879. The only purpose for admitting this evidence was to demonstrate Smith's propensity to commit the acts which resulted in the victim's death in the absence of any direct evidence of abuse. This purpose is specifically prohibited by Rule 404(b), SCRE.

Lastly, evidence of the victim's broken femur was inadmissible pursuant to Rule 403, SCRE. *See* Rule 403, SCRE (stating that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice). This evidence was highly prejudicial and not harmless. *See Fletcher,* 379 S.C. at 26, 664 S.E.2d at 484 (noting the admission of prior bad act evidence when the offender was unsubstantiated was not harmless error because the identity of the perpetrator was the essential issue at trial); *see also Northcutt,* 372 S.C. at 218–19, 641 S.E.2d at 879 (reversing a death penalty conviction due to unfair prejudice pursuant to Rule 403, SCRE, when the trial court admitted evidence of the victim's spiral leg fracture at age ten-weeks despite the fact that the prior injury was, by all accounts, an accident).

Smith's sole defense during trial was that Dandridge committed the acts which resulted in the victim's death. In addition, at the time the trial court admitted the evidence of the victim's broken femur, Smith was only being tried for homicide by child abuse, not aiding and abetting homicide by child abuse. The admission of this evidence was highly prejudicial to Smith as Dandridge was not on trial, and DSS was unable to determine who caused the spiral fracture after investigating the incident. Therefore, I would reverse.

### B. Aiding and Abetting Jury Charge

Smith was indicted for homicide by child abuse under section 16–3–85(A)(1) of the South Carolina Code (2003). That section provides that a person is guilty of homicide by child abuse if the person "causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme

indifference to human life." At the end of trial, the State requested and the trial court decided to charge the jury on section 16–3–85(A)(2) as well, which provides that a person is guilty of homicide by child abuse if the person "knowingly aids or abets another person to commit child abuse or neglect, and the child abuse or neglect results in the death of a child under the age of eleven." Smith was acquitted of the charge for which he was indicted, but the jury found Smith guilty of aiding and abetting homicide by child abuse. On appeal, Smith argues it was error for the trial court to charge the jury on section 16–3–85(A)(2). I agree.

An appellate court will not reverse the trial court's decision regarding jury charges absent an abuse of discretion. *State v. Williams*, 367 S.C. 192, 195, 624 S.E.2d 443, 445 (Ct.App.2005) (citation and quotation marks omitted). "It is well-settled the law to be charged is determined from the evidence presented at trial, and if *any evidence* exists to support a charge, it should be given." *State v. Burriss*, 334 S.C. 256, 262, 513 S.E.2d 104, 108 (1999) (emphasis added).

Setting aside evidence of the broken femur and any evidence collateral to that injury, there was not any evidence presented on which to charge the jury with aiding and abetting homicide by child abuse. Specifically, there was no evidence that Smith *knowingly* aided and abetted Dandridge or any other person to commit homicide by child abuse. *See* section 16–3–85(A)(2).

In conclusion, I would hold evidence of the victim's broken femur should have been excluded under Rule 404(b), SCRE, and Rule 403, SCRE, as it may have been used by the jury as propensity evidence to infer that Smith aided and abetted the acts that ultimately resulted in the victim's death, even though it acquitted him of homicide by child abuse. Because the prior bad act should not have been admitted, there was no evidence to charge the jury with aiding and abetting homicide by child abuse. Accordingly, I would reverse on both grounds.