# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent/Petitioner,

v.

Venancio Diaz Perez, Petitioner/Respondent.

Appellate Case No. 2015-001576

―――――――――――

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

―――――――――――

Appeal from Charleston County
J. C. Nicholson, Jr., Circuit Court Judge

―――――――――――

Opinion No. 27810
Heard November 30, 2016 – Filed June 6, 2018

―――――――――――

## REVERSED

―――――――――――

Jason S. Luck, of Seibels Law Firm, P.A., of Charleston, and Chief Appellate Defender Robert M. Dudek, of Columbia, for Petitioner/Respondent.

Attorney General Alan M. Wilson and Special Assistant Attorney General Amie L. Clifford, both of Columbia, and Solicitor Scarlett A. Wilson, of Charleston, for Respondent/Petitioner.

―――――――――――

**CHIEF JUSTICE BEATTY:**     We granted cross-petitions for a writ of certiorari to review the Court of Appeals' unpublished decision in *State v. Perez*, Op. No. 2015-UP-217 (S.C. Ct. App. filed May 8, 2015), wherein the court determined: (1) the trial court's refusal to admit testimony of a witness' U-visa[1] application was harmless error; (2) the trial court properly admitted evidence of prior bad acts Venancio Diaz Perez committed against another minor; and (3) Perez's sentence was vindictive and a violation of due process.  We reverse the Court of Appeals' decision and remand for a new trial.

## I.     Factual and Procedural History

Perez was indicted on charges of criminal sexual conduct with a minor and lewd act on a minor for acts committed on a child ("Minor 1") whom his wife babysat in their residence.  Prior to trial, the judge held an *in camera* hearing to determine whether to allow another child ("Minor 2"), who Perez's wife also babysat, to testify at trial regarding acts of sexual abuse Perez allegedly committed against Minor 2.  After hearing testimony from both children, the trial court decided to allow Minor 2 to testify pursuant to *State v. Wallace*, 384 S.C. 428, 683 S.E.2d 275 (2009).[2]

At trial, Minor 1 testified to six incidents involving Perez.  Minor 1 described two similar incidents wherein she went into one of the bedrooms to retrieve her PlayStation Portable at which time Perez grabbed her, pulled her into the closet, and began touching her.  In the first incident, Minor 1 alleged Perez "put his hands under [her] clothes and stuck his finger inside of [her]."  In the second, Minor 1 stated

---

[1]  A U-visa allows victims of certain crimes, who have suffered mental or physical abuse and are helpful to the government in the investigation or prosecution of the criminal activity, to be lawfully present in the United States.  8 C.F.R. § 214.14 (2017); Department of Homeland Security, *Victims of Criminal Activity: U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status (last updated August 25, 2017).

[2]  In *Wallace*, this Court held relevant evidence of a defendant's prior bad act that is more probative than prejudicial may be admitted to show a common scheme or plan under Rule 404 of the South Carolina Rules of Evidence ("SCRE") when the similarities between the crime charged and prior bad act outweigh the dissimilarities. *Wallace*, 384 S.C. at 433, 683 S.E.2d at 278.

Perez touched her "front" and "bottom," but, unlike the first incident, there was no digital penetration. Minor 1 also described another incident in which Perez touched her "front" and "bottom" after she hid in a closet during a game of hide-and-seek. Like the second encounter, there was no penetration. In the fourth encounter, Minor 1 testified that while Perez's children were standing in front of the television "acting famous," Perez situated himself in an area of the room so that no one else could see, pulled his pants down, and showed Minor 1 his privates. In another, Minor 1 claimed Perez touched her chest and "front" and bit her on her breasts after she helped him hang wallpaper in the bathroom. In the last incident, Perez began chasing Minor 1 while she was watching a movie so she hid under a bed so that he could not reach her.

On cross-examination, Minor 1 admitted she told her therapist Perez never pulled her into the closet or digitally penetrated her during the first encounter because Perez's children walked in before anything could happen. Minor 1 also stated she did not mention the incident of Perez chasing her under the bed in her movie narrative with her therapist in which she proclaimed to have disclosed everything that occurred between her and Perez. Nor did she include the incident of Perez biting her chest, but testified she nevertheless disclosed that encounter with her therapist. Additionally, at trial, the State asked Minor 1 whether she was wearing a bra at the time of the wallpaper incident. Minor 1 answered "No," explaining she was too young to wear a bra at that time. On cross-examination, however, Minor 1 stated she told her therapist that she was wearing a bra during one of the encounters with Perez.

Minor 2 subsequently testified to two incidents of sexual abuse involving Perez. In one incident, Minor 2 testified she was in one of the bedrooms lying down when Perez got on top of her and touched her on her "top and bottom privates." In the other, Minor 2 stated she fell asleep on the couch in the living room watching a movie and Perez came up behind her and touched her on her "front private."[3]

In addition to Minor 1 and Minor 2, the State called the mother of Minor 1 ("Mother 1") and the mother of Minor 2 ("Mother 2") to testify. On cross-examination, Mother 1 stated she came to the United States from Mexico illegally

---

[3] Although it was not discussed at trial, during the pretrial hearing, Minor 2 also alleged Perez touched her while she was helping him fix a doorknob. Additionally, Minor 2 asserted Perez had sexual intercourse with her inside a closet; however, the trial court did not allow Minor 2 to testify regarding the intercourse at trial.

in 2000.  After Minor 1 reported the abuse, the victim advocate informed Mother 1 about U-visas and directed Mother 1 to an attorney who could assist her in filing an application.  As a result of submitting her U-visa application, Mother 1 testified she became eligible for food stamps, which she now receives.  Moreover, without the U-visa application, Mother 1 explained she would be considered an illegal immigrant and would be at risk of being deported.

Defense counsel attempted to elicit similar testimony from Mother 2, who was also in the country illegally, but the trial court refused to admit testimony concerning Mother 2's U-visa application, stating:

> I let you go into the visa and the legal status [of Mother 1] because she was the mother of the victim.  I'm not going there with this witness. That has nothing to do with this case.  I don't think it has anything to do with bias or anything and we're not going there, okay?

Nevertheless, the trial court permitted defense counsel to proffer the following testimony outside the presence of the jury:  Mother 2 learned about U-visas from an information sheet she received at the Lowcountry Children's Center when her daughter was being examined; Mother 2 had applied for a U-visa with the assistance of an attorney; and, unlike Mother 1, Mother 2 had not applied for any government benefits.

At the conclusion of the trial, the jury returned a verdict of not guilty of criminal sexual conduct with a minor, but ultimately found Perez guilty of lewd act on a minor and of assault and battery of a high and aggravated nature ("ABHAN"). The trial court sentenced Perez to fifteen years for the lewd act on a minor conviction and to a consecutive ten years for the ABHAN conviction with credit for time served. Perez subsequently objected, arguing the sentence was vindictive and punishment for exercising his right to trial.  The trial court denied Perez's motion to find the sentence vindictive and Perez appealed his convictions and sentence.

In an unpublished opinion, the Court of Appeals determined the trial court erred in refusing to allow evidence of Mother 2's U-visa application into evidence, but determined the error was harmless beyond a reasonable doubt.  *State v. Perez*, Op. No. 2015-UP-217 (S.C. Ct. App. filed May 8, 2015), *3-4.  The court affirmed the trial court's decision to admit Minor 2's testimony pursuant to *Wallace*.  *Id*. at *2. Finally, the court reversed and remanded for resentencing after determining Perez's sentence was vindictive and a violation of due process.  *Id*. at *4-5.  Then-Chief

Judge Few filed a concurring opinion wherein he concurred with the majority as to the first two issues, but wrote separately to note that he would remand the case to the trial court to clarify the basis on which it sentenced Perez. *Id*. at *6.

Both parties petitioned this Court for a writ of certiorari. Perez argued the Court of Appeals erred in: (1) finding the trial court's refusal to admit evidence of Mother 2's U-visa harmless error; (2) affirming the trial court's admission of Minor 2's testimony; and (3) failing to remand the case to a different judge for sentencing. The State contended the Court of Appeals erred in finding Perez's sentence was vindictive. We granted both petitions.

## II. Standard of Review

In criminal cases, this Court sits solely to review errors of law. *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). "This Court will not disturb a trial court's ruling concerning the scope of cross-examination of a witness to test his or her credibility, or to show possible bias or self-interest in testifying, absent a manifest abuse of discretion." *State v. Gracely*, 399 S.C. 363, 371, 731 S.E.2d 880, 884 (2012). An abuse of discretion occurs when the trial court's ruling is based on an error of law or is based on findings of fact that are without evidentiary support. *State v. Jennings*, 394 S.C. 473, 477-78, 716 S.E.2d 91, 93 (2011).

## III. Discussion

### Whether the Court of Appeals erred in finding the trial court's refusal to admit evidence of Mother 2's U-visa was harmless error.

The Court of Appeals held the trial court's refusal to allow Perez to cross-examine Mother 2 regarding her U-visa application constituted a violation of Perez's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. *Perez*, at *3; *see* U.S. Const. amend. VI (stating "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him"); *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (providing a defendant demonstrates a Confrontation Clause violation when he is prohibited from "engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness . . . 'from which jurors . . . could appropriately draw inferences relating to the reliability of the witness'" (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974))).

According to the Court of Appeals:

> [T]here is no question Mother 2's veracity and potential bias was an important issue. Any evidence showing Mother 2 applied for or obtained the visa because her daughter was a victim of abuse and they both assisted with the prosecution was relevant impeachment evidence. Mother 2's immigration status and possible visa application was relevant to any theory that the victims falsely alleged these crimes in an attempt to gain citizenship for their parents. Further, even accepting Minor 2's testimony as true, Mother 2's U visa testimony was relevant to establish bias by demonstrating Mother 2 agreed to participate in the investigation or encouraged Minor 2 to participate in order to obtain the visa.

*Perez*, at *3-4. The court, however, concluded the error was harmless beyond a reasonable doubt. *Id.* at *4; *see Gracely*, 399 S.C. at 375, 731 S.E.2d at 886 ("A violation of the Confrontation Clause is not per se reversible but is subject to a harmless error analysis."). In its petition for rehearing, the State did not challenge the court's finding that the trial court's failure to admit the evidence was error; therefore, the only question before us on this issue is whether the error was harmless. *See ML-Lee Acquisition Fund, L.P. v. Deloitte & Touche*, 327 S.C. 238, 241, 489 S.E.2d 470, 472 (1997) (holding an unchallenged ruling becomes the law of the case regardless of whether the ruling is correct).

"A [C]onfrontation [C]lause error is harmless if the evidence is overwhelming and the violation so insignificant by comparison that we are persuaded, beyond a reasonable doubt, that the violation did not affect the verdict." *State v. Holder*, 382 S.C. 278, 285, 676 S.E.2d 690, 694 (2009) (quoting *State v. Vincent*, 120 P.3d 120, 124 (Wash. Ct. App. 2005)). When determining whether an error is harmless, this Court considers, *inter alia*: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

In finding the trial court's error in failing to admit testimony of Mother 2's U-visa application harmless, the Court of Appeals reasoned:

Perez proffered no evidence Mother 2 knew about U visas before she reported Perez's acts against Minor 2. Without such evidence, Mother 2's undocumented status *made it less likely she would falsely report a crime because this would bring her to the State's attention and possibly lead to her deportation*. *Moreover, nothing in Mother 2's proffered testimony suggests the State's recommendation that Mother 2 obtain a U visa was quid pro quo for her or Minor 2's testimony*. Mother 2 denied someone from the solicitor's office put her in contact with an attorney to assist with the application. She also denied "a victim advocate or helper" put her in touch with an immigration attorney. She simply stated she found out about the attorney assisting with the application "[w]hen we went for [Minor 2] to have her questioning and exam[,] they gave us several information sheets and that was one of them." Also, unlike Minor 1's mother, Mother 2 denied having applied for other governmental benefits such as food stamps since she applied for the U visa. *Therefore, Mother 2's proffered testimony does not suggest "[Mother 2] was receiving assistance from the State in exchange for her daughter's testimony," or that her "testimony against Perez was 'bought and paid for' by the State via U [v]isas' as Perez argues*.

*Perez*, at *4 (emphasis added).

We find the Court of Appeals' credibility analysis inappropriate for appellate review. As appellate courts in this state have recognized:

> Even where the evidence is uncontradicted, the jury may believe all, some, or none of the testimony, and where the credibility of the witness has been questioned, the matter is properly left to the jury to decide: "The fact that evidence is not contradicted by direct evidence does not render it undisputed, as there still remains the question of its inherent probability and the credibility of the witnesses or his interest in the result. . . . If there is anything tending to create distrust in his truthfulness, the question must be left to the jury."

*Ross v. Paddy*, 340 S.C. 428, 434, 532 S.E.2d 612, 615 (Ct. App. 2000) (quoting *Terwilliger v. Marion*, 222 S.C. 185, 188, 72 S.E.2d 165, 166 (1952)). Perez's jury was not given an opportunity to assess the credibility of Mother 2. Therefore, we agree with Perez that "the Court of Appeals has, in effect, improperly ruled on the

credibility and weight of [Mother 2's] testimony and usurped the role of the jury." Giving due consideration to the *Van Arsdall* factors, we also agree with Perez that the trial court's error in refusing to admit Mother 2's testimony concerning her U-visa application was not harmless beyond a reasonable doubt.

Here, because there was no physical evidence of the alleged abuse, the case rested solely on credibility determinations. Thus, Perez's opportunity to elicit testimony from the State's witnesses regarding any potential bias was critical to his defense.

In particular, Mother 1 and Mother 2 both applied for U-visas as a result of Minor 1's and Minor 2's accusations. Considering the significance of obtaining a U-visa and the manner in which the visa is acquired, a jury could see the U-visa applications as a means of establishing bias in Minor 1, Minor 2, Mother 1, and Mother 2. *See Romero-Perez v. Commonwealth*, 492 S.W.3d 902, 906 (Ky. Ct. App. 2016) (recognizing the U-visa program's requirement that the victim be helpful to the prosecution could incentivize the victim to fabricate allegations or embellish their testimony in order to have their U-visas granted). Indeed, even the Court of Appeals acknowledged that Mother 2's U-visa testimony was relevant "to any theory that the victims falsely alleged these crimes in an attempt to gain citizenship for their parents" as well as "to establish bias by demonstrating Mother 2 agreed to participate in the investigation or encouraged Minor 2 to participate in order to obtain the visa." *Perez*, at *4. Therefore, prohibiting Mother 2 from testifying about her U-visa application prevented Perez from establishing a full picture of the witnesses' biases. Moreover, testimony concerning Mother 2's U-visa application would not have been cumulative to other testimony in the record.

Although the failure to admit evidence of a witness' U-visa does not automatically equate to reversible error, we find the trial court's failure to admit evidence of Mother 2's U-visa application particularly significant in this case given: (1) the lack of physical evidence of the alleged abuse; and (2) Minor 1's conflicting testimony. *See Gracely*, 399 S.C. at 377, 731 S.E.2d at 887 ("In a case built on circumstantial evidence, including testimony from witnesses with . . . suspect credibility, a ruling preventing a full picture of the possible bias of those witnesses cannot be harmless.").

For these reasons, we find the Confrontation Clause violation was not harmless. Accordingly, we reverse the Court of Appeals' decision and remand for a new trial. *See State v. Henson*, 407 S.C. 154, 754 S.E.2d 508 (2014) (ordering a new

trial after finding the Confrontation Clause violation was not harmless error).  Based on our disposition of this issue, we decline to reach the remaining issues on appeal. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing this Court need not address remaining issues when disposition of prior issue is dispositive of the appeal).

### IV.    Conclusion

Accordingly, we reverse the Court of Appeals' decision and remand for a new trial.

**REVERSED AND REMANDED.**

**KITTREDGE, J., and Acting Justice James E. Moore, concur.  HEARN, J., concurring in a separate opinion in which BEATTY, C.J., concurs.  Acting Justice Pleicones not participating.**

**JUSTICE HEARN:** I concur in the result reached by the majority; however, I write separately because I believe the Court should take this opportunity to overturn our holding in *State v. Wallace*, 384 S.C. 428, 683 S.E.2d 275 (2009), which, in my opinion, has so expanded the admissibility of prior bad acts in sexual offense cases that the exception has swallowed the rule.

Generally, evidence of a person's character is not admissible to prove he acted in conformity therewith. Rule 404(a), SCRE. Accordingly, evidence of prior crimes or bad acts is admissible only in limited circumstances—to show motive, identity, the existence of a common scheme or plan, the absence of mistake, or intent. Rule 404(b), SCRE. The seminal case in South Carolina establishing the test for admissibility of prior bad acts is *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923). In *Lyle*, the defendant was charged with forging a check in Aiken and the State sought to admit into evidence several prior acts of forgery that took place in Georgia. Explaining the admissibility of those prior offenses based on the common scheme or plan exception, this Court held,

> Whether such crime was committed as part of a common plan or system was wholly immaterial, unless proof of such system would serve to identify the defendant as the perpetrator of the particular crime charged or was necessary to establish the element of criminal intent. Proof of a common plan or system, therefore, in this connection is merely an evidential means to the end of proving identity or guilty intent, and involves the establishment of such a visible connection between the extraneous crimes and the crime charged as will make evidence of one logically tend to prove the other as charged. If, as we have seen, no such connection was shown to exist between the separate Georgia offenses and the Aiken crime as would constitute them practically "a continuous transaction" or as would otherwise render this evidence relevant to prove identity, and if, as we have held, the evidence was not competent on the question of intent, it follows that it was not admissible merely to show plan or system.

*Id.* at 427, 118 S.E. at 811 (internal citations omitted).

Decades later, the Court revisited the common scheme or plan exception in the context of sexual offenses and declined to adopt the more relaxed rule used in several other jurisdictions which allowed the introduction of prior sexual offenses to prove a defendant's "lustful disposition." *State v. Nelson*, 331 S.C. 1, 14 n. 16, 501 S.E.2d 716, 723 n. 16 (1998). Presciently, the *Nelson* court cautioned against the

expansion of the exception lest it become a "cleverly disguised way of getting impermissible character evidence before the jury." *Nelson*, 331 S.C. at 14, 501 S.E.2d at 723; *see also Daggett v. State*, 187 S.W.3d 444, 451–52 (Tex. Crim. App. 2005) ("Repetition of the same act or same crime does not equal a 'plan.' It equals the repeated commission of the same criminal offense offered obliquely to show bad character and conduct in conformity with that bad character—'once a thief, always a thief.'") (footnote omitted).

However, in a marked departure from earlier case law requiring some connection between crimes beyond mere similarity in order to meet the common scheme or plan exception, *see State v. Hough*, 325 S.C. 88, 95, 480 S.E.2d 77, 80 (1997), the *Wallace* majority held, "A close degree of similarity establishes the required connection between the two acts and no further 'connection' must be shown for admissibility." 384 S.C. at 434, 683 S.E.2d at 278. Under this framework, prior bad acts are admissible as a common scheme or plan in sexual abuse cases when the similarities to the charged crime outweigh the dissimilarities. *Id.* at 433, 683 S.E.2d at 278.

I believe *Wallace* broadened the common scheme or plan exception to such an extent that it no longer has a meaningful exclusionary effect in sexual offense cases. Without requiring a greater degree of connection beyond only a mere similarity, the exception has been enlarged such that it has become simply a means to prove a defendant's criminal propensity. *See State v. Ives*, 927 P.2d 762, 768 (Ariz. 1996) ("A broad definition of 'common scheme or plan' allows the state to raise the inference of guilt based solely on 'a disposition toward criminality.'"). This is contrary to Rule 404(a), SCRE, and the traditional principle enunciated in *Lyle* that common scheme or plan evidence is not competent unless it demonstrates a continuous transaction or has some bearing on the defendant's identity or guilty intent. *See State v. Aakre*, 46 P.3d 648, 655 (Mont. 2002) ("Put another way, the government must prove that the prior crimes, wrongs or acts and the charged offense *are linked as integral components* of the defendant's common purpose or plan to commit the *current charge*.") (emphasis added).

The dangers in permitting the liberal admission of such prior bad acts are readily apparent. In fact, this Court has repeatedly warned of the prejudicial dangers stemming from the introduction of prior bad acts which are similar to the one for which the defendant is being tried. *See, e.g., State v. Brooks*, 341 S.C. 57, 62, 533 S.E.2d 325, 328 (2000); *State v. Gore*, 283 S.C. 118, 121, 322 S.E.2d 12, 13 (1984). Absent an amendment to our rules of evidence creating a different categorical rule for sexual offenses, I would apply the common scheme or plan exception equally to

sexual and nonsexual offenses alike. In the context of sexual offenses, mere similarities alone do not necessarily establish a logical connection between the crime charged and the prior bad acts such that the existence of one tends to prove the existence of the other.[4] *See State v. Fletcher*, 379 S.C. 17, 23, 664 S.E.2d 480, 483 (2008) ("To be admissible, the bad act must logically relate to the crime with which the defendant has been charged."). Similarity between the prior bad act and the crime charged is not the type of connection such that proof of one is proof of the other. *See State v. Moore*, 6 S.W.3d 235, 241 (Tenn. 1999) ("A common scheme or plan is not found merely because the similarities of the offenses outweigh the differences. Rather, the trial court must find that a distinct design or unique method was used in committing the offenses before an inference of identity may properly arise.") (footnote omitted).

Accordingly, I would overrule *Wallace* and restore the common scheme or plan exception in sexual misconduct cases to its original purpose as articulated in *Lyle* whereby proof of a common plan or system requires "the establishment of such a visible connection between the extraneous crimes and the crime charged as will make evidence of one logically tend to prove the other as charged." Just as mere similarities between the prior bad act and the crime charged would be insufficient in the case of all other crimes, it should likewise be insufficient when sexual misconduct is involved.

**BEATTY, C.J., concurs.**

---

[4] The *Wallace* court stated, "Such evidence is relevant because proof of one is strong proof of the other." 384 S.C. at 433, 683 S.E.2d at 277. I find this statement at odds with the Court's subsequent holding establishing similarity as the baseline test for admissibility because similarity with prior bad acts does not necessarily constitute "strong proof" of the offense for which the defendant is being tried. Rather, the emphasis on similarity suggests the probative value of prior bad acts goes towards the defendant's propensity to act in conformity with those bad acts, undermining the strong policy against character evidence. *See State v. Melcher*, 678 A.2d 146, 149 (N.H. 1996) (explaining New Hampshire's Rule 404(b) "serves 'to ensure that the defendant is tried on the merits of the crime as charged and to prevent a conviction based on evidence of other crimes or wrongs[]'").