IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35752-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSE MANUEL QUINTERO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Federal law provides for a U visa, which can be obtained by

someone illegally in the United States who (among other requirements) has been helpful

to a law enforcement agency in the investigation or prosecution of a qualifying crime.

Several appellate courts from around the country have held that where a State's witness

in a criminal case has applied for a U visa and been promised State support for the

application if their testimony proves helpful, the defendant must be allowed to question

the witness about that possible motivation for the witness's testimony.

At Jose Quintero's trial, two witnesses against him were promised by the State that

if they provided the type of help required for the U visa, it would sign off on a required

certification of their assistance. The trial court ruled that the defense could not question

either witness about the State's promise because it would necessarily reveal their

undocumented status, which would be unduly prejudicial,

In this case, neither witness against Mr. Quintero had applied for a U visa by the

time of trial and the defense was able to demonstrate only a possibility that the witnesses

would apply, qualify, and realize any benefit from the State's promise. Because the

evidence that Mr. Quintero sought to develop was not highly probative, we find no error

or abuse of discretion in the trial court's decision to exclude it as unduly prejudicial. We

affirm the convictions but remand with directions to address a challenged DNA

(deoxyribonucleic acid) collection fee.

FACTS AND PROCEDURAL BACKGROUND

In April 2016, Jose Quintero, a member of the 18th Street Gang in Walla Walla,

was charged with the first degree murder of Janette Rojas Balderas and her boyfriend,

Jon Cody Cano, as well as first degree unlawful possession of a firearm. The State would

present evidence at trial that Ms. Rojas had been an informant for the Walla Walla police,

participating in 15 controlled drug buys until, in 2015, she told police that the 18th Street

Gang had "green-lighted" her—meaning she had been identified as okay to kill. Report

of Proceedings (RP) at 963.

One of Ms. Rojas's controlled drug buys was from Charley Lozano, who was

charged and later pleaded guilty to delivery of methamphetamine. At the time of the

Rojas and Cano murders, Mr. Lozano was the only individual from whom Ms. Rojas had

2

both done a controlled buy and whose case had proceeded to the point where her identity would have been revealed to his defense lawyer.

Mr. Lozano was scheduled to be sentenced on his drug conviction on Monday, August 10, 2015. A "going away" party for Mr. Lozano was held the prior Friday night. At around midnight that night, as Ms. Rojas and Mr. Cona sat outside their home, Ms. Rojas was shot 11 times and Mr. Cona was shot 5 times. Both died.

Months later, Mr. Lozano and Mr. Quintero were identified as the shooters. Two key State witnesses were Birzavit Carmona-Hernandez and Diego Bante Rivera, both members of the 18th Street Gang with whom Mr. Quintero had shared a cell while in jail following his arrest for the murders. Mr. Quintero allegedly told both men that he and Mr. Lozano shot Ms. Rojas and her boyfriend because she was an informant. The principal issue on appeal concerns limits that the trial court imposed on cross-examination of Mr. Carmona-Hernandez and Mr. Bante Rivera.

*Birzavit Carmona-Hernandez*

In May 2017, many months before Mr. Quintero's October 2017 trial, the State arranged a perpetuation deposition of Mr. Carmona-Hernandez and moved the court for an order in limine preventing Mr. Quintero's lawyer from inquiring into certain gang matters and Mr. Carmona-Hernandez's immigration status. The perpetuation deposition

had been scheduled because Mr. Carmona-Hernandez was subject to "an ICE[1] hold,"

and may or may not be available for trial. RP at 92. It was made clear at the hearing on

the motion that any rulings the trial court made were preliminary and addressed evidence

that would be admitted *at trial*; they would not preclude defense counsel from

questioning Mr. Carmona-Hernandez during the deposition in order to create a record for

an offer of proof.

Relevant to this appeal, the State wanted the trial court to preclude questioning

about the fact that Mr. Carmona-Hernandez did not have citizenship status in the United

States and was subject to deportation. The prosecutor was aware that defense counsel

wanted to explore with Mr. Carmona-Hernandez assistance the State had agreed to

provide him in obtaining a U visa to remain in the United States. A U visa, provided for

by the federal Immigration Naturalization Act, can be applied for by a victim of crime

who has "suffered substantial physical or mental abuse as a result of having been a

victim" of qualifying criminal activity and who "has been helpful, is being helpful, or is

likely to be helpful to a Federal, State, or local law enforcement official, to a Federal,

State, or local prosecutor, to a Federal or State judge . . . or local authorities investigating

or prosecuting criminal activity." 8 U.S.C. § 1101(a)(15)(U)(i)(I), (III). The duration of

a U visa, once granted, is up to four years and may be extended. 8 C.F.R. § 214.14(g).

---

[1] United States Immigration and Customs Enforcement.

After three years, U visa holders are eligible for adjustment of status from "nonimmigrant" to "lawfully admitted permanent residen[t]" if the visa holder's provision of information "has substantially contributed to the success of an authorized criminal investigation or the prosecution of an individual." 8 U.S.C. § 1255(j).

The State had agreed that if Mr. Carmona-Hernandez applied for a U visa claiming that he was eligible based on testimony helpful in the prosecution of Mr. Quintero, the prosecutor's office would review any statement required of the State and, if appropriate, would sign it. The prosecutor insisted that providing a statement in support of a U visa had never been a part of the deal offered for Mr. Carmona-Hernandez's testimony in Mr. Quintero's case. The prosecutor told the court, "When he pled guilty, his immigration status was not even in issue." RP at 92.

Given an opportunity to respond, Mr. Quintero's lawyer represented to the trial court that based on her discussion with gang detectives, Mr. Carmona-Hernandez had a history of gang involvement for well over 10 years, which "renders him the highest potential priority for deportation." RP at 96. She continued, "[T]hat places him in extreme peril, gives him a very high incentive to do what he needs to do to get the cooperation from the State to be able to help him try to get this visa form that would then give him a legal authority to stay here." RP at 97. She said that while she sympathized with individuals who were brought to the United States as children and were faced with deportation from the only place they had ever known—apparently Mr. Carmona-

5

Hernandez's situation—"[T]he problem is now that's exactly what he has the motivation

to avoid. That's what he is at risk of. That's why it's relevant." RP at 100.

The trial court acknowledged a legitimate defense interest in attacking Mr.

Carmona-Hernandez's truthfulness by demonstrating a motive for cooperating with the

State, but explained:

> The whole problem with the issue is that it's so highly toxic at this point in
> time. You bring up the issue of immigration and immigration law, the
> potential for deportation, and immediately the focus of the jury isn't on this
> trial, it's going to be on, well, what's happening here? Is this guy going to
> be deported? Does that give him a motive to lie? And should we just
> disregard his testimony totally, instantly because of it?
> I suppose there might be people on the jury who feel just the
> opposite, that they're overwhelmed with sympathy but at the same time
> their view of the testimony would be so colored by the fact of this issue—
> long story short, I think it's too toxic, too prejudicial, and my preliminary
> ruling at this time is I'm not going to allow it.

RP at 107.

Mr. Carmona-Hernandez turned out to be available for trial, and Mr. Quintero's

pretrial motions in limine asked the trial court to reconsider its preliminary ruling

foreclosing cross-examination about Mr. Carmona-Hernandez's U visa understanding

with the State. It supported the motion with testimony given by Mr. Carmona-Hernandez

at his perpetuation deposition. Among statements made by Mr. Carmona-Hernandez in

the deposition excerpts provided to the court were that after his plea deal, the State agreed

to sign off on a U visa. Mr. Carmona-Hernandez testified that he did not really know

what a U visa was, but his understanding was that it would help him "[t]o stay here in the

6

United States." Clerk's Papers (CP) at 169. There was no discussion of whether Mr.

Carmona-Hernandez had applied for a U visa or how he had been victimized in a way

that would qualify him for the visa. He testified that he "kind of" had an immigration

lawyer, "but not really, not right now." CP at 165. The trial court stood by its

preliminary ruling.

At trial, Mr. Carmona-Hernandez testified that he, like Mr. Quintero, was a

member of the 18th Street Gang. Mr. Carmona-Hernandez had been arrested a couple of

years earlier and charged with first degree murder, first degree assault, and intimidating a

witness in an unrelated case and upon being arrested, had shared a cell with Mr. Quintero

for about a week. He told jurors that not only did Mr. Quintero tell him that he and Mr.

Lozano murdered Ms. Rojas and her boyfriend, but Mr. Quintero had also described the

handguns he and Mr. Lozano had used. Mr. Carmona-Hernandez testified that he

informed police, through his wife, of the information he could provide about the Rojas

and Cona murders. Asked by the prosecution if he had asked for anything in return for

the information, Mr. Carmona-Hernandez said he did not. He testified that in later

providing additional information, he still did not ask for anything in return.

Mr. Carmona-Hernandez did admit that when he eventually pleaded guilty, it was

with the understanding that his charges would be reduced to misdemeanors if he agreed

to testify for the State in Mr. Quintero's case. He was allowed to plead guilty to fourth

degree assault and criminal mischief.

Outside the presence of the jury, defense counsel asked the trial court to revisit the issue of the admissibility of Mr. Carmona-Hernandez's immigration status, since the State had elicited his testimony that he asked for nothing in exchange for the information he provided. The trial court adhered to its ruling, pointing out that the dramatic reduction in the charges against Mr. Carmona-Hernandez—from first degree murder to misdemeanors—was significant by itself, providing the defense with a basis for arguing his motivation.

In cross-examining Mr. Carmona-Hernandez thereafter, defense counsel asked why it was important to him to avoid felony charges. He responded, "Because I'm an illegal alien and I didn't want to get no felonies. Felonies are deportable." RP at 694. Defense counsel relied on that statement as a further reason the trial court should reconsider its ruling, but the trial court was unpersuaded. It did not strike Mr. Carmona-Hernandez's testimony about being an illegal alien and subject to deportation, however.

*Witness: Diego Bante Rivera*

Later in the trial, the State called Mr. Bante Rivera to testify. The State had never moved in limine to prevent the defense from questioning Mr. Bante Rivera about his immigration status, and Mr. Quintero's pretrial motions in limine sought permission to impeach only Mr. Carmona-Hernandez with evidence of immigration benefits promised by the State.

8

In his direct examination, Mr. Bante Rivera testified that while spending a couple of months in a jail cell with Mr. Quintero less than two years earlier, Mr. Quintero told him that he and Mr. Lozano shot Ms. Rojas and her boyfriend because Ms. Rojas was a snitch. He testified that Mr. Quintero also told him about the .9 millimeter and .25 caliber handguns they used in the shootings.

Mr. Bante Rivera testified that in July 2016, months after Mr. Quintero told him about his and Mr. Lozano's role in the murders, Walla Walla police had interviewed him for about 30 minutes. He refused to provide any information about the Rojas and Cano murders because, he said, "I was still part of the gang and there was a code that you are not supposed to say nothing to the cops." RP at 1134. Members of the 18th Street Gang apparently incorrectly believed he provided information to police however, because shortly after the interview, gang members shot Mr. Bante Rivera 13 times, leaving him paralyzed from the chest down. After he was released from the hospital, Mr. Bante Rivera agreed to speak with police about the shootings. He testified that being shot by his fellow gang members "changed the way . . . I view things and what my family wanted." RP 1135-36.

It was only during Mr. Bante Rivera's redirect examination that the State triggered an evidentiary issue about immigration status by asking if he "receiv[ed] any benefit" for the information he provided or was providing. RP at 1146. He answered no. Early in re-cross-examination, defense counsel asked the trial court outside the presence of the jury

9

whether she could inquire about the State's offer to support a U visa for Mr. Bante

Rivera, telling the court that

> [a]t our previous interview, as with the case of Mr. Carmona Hernandez,
> the State indicated that it was intending to participate in helping him
> become a United States citizen by writing a letter in support of an
> application for a U-Visa. We think that the nature of the question that was
> asked and the answer that was given, answer to the jury, is misleading
> because it necessarily leads the jury to think there is no benefit whatsoever
> contemplated. That is plainly not the case. In light of the communications
> that have been had, there is an expectation of a benefit with the immigration
> assistance.

RP at 1154. Defense counsel made no representation to the court that Mr. Bante Rivera

was likely to be deported, as she had when arguing for the right to cross-examine Mr.

Carmona-Hernandez. The trial court adhered to its prior rulings, adding, "It is also

highly uncertain as to whether or not there would be any benefit derived in fact." RP at

1155.

The jury found Mr. Quintero guilty as charged. With consecutive sentencing for

the murder counts, he was sentenced to a total term of confinement of 780 months. The

court ordered Mr. Quintero to pay restitution in the amount of $14,048.26 and imposed

the $200.00 criminal filing fee, $500.00 for the crime victim fund, and the $100.00 DNA

collection fee. Mr. Quintero appeals.

ANALYSIS

I.   EXCLUSION OF U VISA EVIDENCE

The principal issue on appeal is whether the trial court erred or abused its discretion in prohibiting the defense from cross-examining Mr. Carmona-Hernandez and Mr. Bante Rivera about their immigration status and the prospect of obtaining a U visa. Mr. Quintero contends the trial court abused its discretion in finding the evidence unduly prejudicial under ER 403 and violated his right to due process by depriving him of the ability to present a defense. Additionally, he relies on case law holding that evidentiary rulings that deny the right of effective cross-examination violate the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. Constitutional issues, such as an asserted violation of a defendant's confrontation clause and due process rights, are reviewed de novo on appeal. *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

Both the state and federal constitutions guarantee a criminal defendant the right to present a defense and to confront adverse witnesses at trial. *State v. Romero-Ochoa*, 193 Wn.2d 341, 347, 440 P.3d 994 (2019). "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316-17, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) (citing *Greene v. McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959)). "A defendant has a right to cross-examine the State's witness concerning

possible self-interest in cooperating with the authorities." *State v. Pickens*, 27 Wn. App. 97, 100, 615 P.2d 537 (1980).

The State argued below and argues on appeal that its agreement to review and, if appropriate, sign a certification is only relevant if it was part of a plea agreement with the witnesses. The case law does not support that distinction. It recognizes a defendant's right to expose a witness's motivation regardless of when or how that motivation arose.

The threshold to admit relevant evidence is very low; even minimally relevant evidence is admissible. *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). The State informed Mr. Quintero's trial lawyer that it had understandings with Mr. Carmona-Hernandez and Mr. Bante Rivera that if they applied for a U visa, the prosecutor's office would review and, if appropriate, sign certifications that they were helpful in the prosecution of qualifying criminal activity. Evidence that the men knew their testimony could help them get a visa to remain in the United States was relevant to motivation.

Where the State seeks to exclude relevant evidence on the basis that it is prejudicial, the State's burden for constitutional purposes is "'to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial.'" *Jones*, 168 Wn.2d at 720 (quoting *Darden*, 145 Wn.2d at 622). "The State's interest in excluding prejudicial evidence must also 'be balanced against the defendant's need for the information sought,' and relevant information can be withheld only 'if the State's interest outweighs the defendant's need.'" *Id.* (quoting *Darden*, 145 Wn.2d at 622). "For

evidence of *high* probative value 'it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. 1, § 22.'" *Id.* (quoting *State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983)).[2]

Courts in several other jurisdictions have held that an order foreclosing the cross-examination of a State witness in a criminal case about the witness's pending application for a U visa violates the confrontation clause or is an abuse of the trial court's discretion. As observed by the court in a Kentucky case:

> One can readily see how the U-Visa program's requirement of "helpfulness" and "assistance" by the victim to the prosecution could create an incentive to victims hoping to have their U-Visa's granted. Even if the victim did not outright fabricate the allegations against the defendant, the structure of the program could cause a victim to embellish her testimony in the hopes of being as "helpful" as possible to the prosecution.

*Romero-Perez v. Commonwealth*, 492 S.W.3d 902, 906 (Ky. Ct. App. 2016); *see also*

*State v. Perez*, 423 S.C. 491, 816 S.E.2d 550 (2018) (prohibiting testimony about a witness's U visa application prevented defendant from establishing a full picture of her

---

[2] Under state evidence rules, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. ER 403. We review a trial court's balancing of probative value against prejudice for abuse of discretion. *State v. Kennealy*, 151 Wn. App. 861, 890, 214 P.3d 200 (2009). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

We lead with review of the constitutional challenge, with its bright line that "highly probative" impeachment evidence will not be outweighed by an assertion of prejudice, and as to which our review is de novo. It follows from our finding of no constitutional error that the trial court did not abuse its discretion in applying ER 403.

bias and was not harmless); *State v. Valle*, 255 Or. App. 805, 815, 298 P.3d 1237 (2013)

(trial court's exclusion of evidence was harmful because the jury was not fully informed

of matters relevant to an assessment of the witness's credibility, which was essential to

the State's case).  In *Commonwealth v. Sealy*, the Supreme Court of Massachusetts held

that the trial court did not abuse its discretion in excluding evidence of a remote incident

in which the alleged victim received immigration-related assistance, recognizing that the

judge had "permitted extensive inquiry into how the victim learned of her eligibility for a

U-Visa, her knowledge of the visa's legal requirements and benefits, and the

circumstances of her application."  467 Mass. 617, 624, 6 N.E.3d 1052 (2014).[3]

In all of the cases cited, the witness who was impeached, or who the criminal

defendant sought to impeach, had applied for a U visa.  In this case, the evidence

suggests that neither witness had made application.  Where a witness has already made an

application for a U visa, there is a stronger implication that the benefits of obtaining the

visa could be a motivation for the witness's testimony.

---

[3] Earlier this year, our Supreme Court reviewed an unpublished decision of Division Two of this court that had found constitutional error when the trial court excluded evidence that the testifying victim had applied for a U visa.  *Romero-Ochoa*, 193 Wn.2d 341.  There, as here, the trial court's concern had been with the prejudicial nature of the immigration evidence.

The State appealed only the appellate court's finding that the error was, for the most part, harmful error, requiring reversal.  The Supreme Court reversed, finding the error to be harmless as to all of the counts.

Even more importantly, the offer of proof in this case established only a possibility that Mr. Carmona-Hernandez and Mr. Bante Rivera would apply, qualify, and realize any benefit from the State's promise. No evidence was offered that Mr. Carmona-Hernandez could meet the requirement of 8 U.S.C. § 1101(a)(15)(U)(i)(I) that he has suffered substantial physical or mental abuse as a victim of a qualifying crime. In the hearing preceding the perpetuation deposition, defense counsel told the court she questioned whether Mr. Carmona-Hernandez could meet the victim requirement and she intended to ask him about that. The deposition excerpts she later filed with the court did not include testimony explaining how he qualified as a victim. They did include Mr. Carmona-Hernandez's testimony that he did not "really" have an immigration attorney helping him "right now." CP at 165.

As for Mr. Bante Rivera, there was no offer of proof that he faced a substantial risk of deportation as there had been with Mr. Carmona-Hernandez. The trial court commented on this in adhering to its ruling, stating that not only would the questioning be prejudicial, but "[i]t is also highly uncertain as to whether or not there would be any benefit derived in fact." RP at 1155.

Washington courts have recognized that evidence of a witness's undocumented status can be prejudicial and distract jurors from the important matters submitted for their determination. In *State v. Avendano-Lopez*, this court held that "appeals to nationality or other prejudices are highly improper in a court of justice, and evidence as to the race,

color, or nationality of a person whose act is in question is generally irrelevant and inadmissible *if introduced for such a purpose.*" 79 Wn. App. 706, 718, 904 P.2d 324 (1995) (emphasis added). In 2010, our Supreme Court agreed that a plaintiff's undocumented status was relevant to his claim for lost earnings even given his low risk of being deported, given that ER 401 requires minimal relevance. *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 670, 230 P.3d 583 (2010). It nonetheless recognized that "[i]ssues involving immigration can inspire passionate responses that carry a significant danger of interfering with the fact finder's duty to engage in reasoned deliberation," and, "[i]n light of the low probative value of immigration status with regard to lost future earnings, the risk of unfair prejudice brought about by the admission of a plaintiff's immigration status is too great." *Id.* at 672.[4]

In Mr. Quintero's trial, the defense did not offer the evidence for an improper purpose. If it had been able to present evidence that Mr. Carmona-Hernandez or Mr. Bante Rivera were motivated by the prospect of obtaining a U visa beyond the State's

---

[4] Following Mr. Quintero's trial, ER 413 became effective and governs the admissibility of evidence of immigration status. It provides that in criminal cases, a party proposing to offer evidence of immigration status for an impeachment purpose under ER 607 must make a written pretrial motion that includes an offer of proof supported by affidavit, and that following a hearing the trial court may admit the evidence "if it finds the evidence is reliable and relevant, and that its probative value outweighs the prejudicial nature of evidence of immigration status." ER 413(a)(1)-(4). Elsewhere the rule provides, "Nothing in this section shall be construed to exclude evidence that would result in the violation of a defendant's constitutional rights." ER 413(a)(5).

bare offer—for instance, if it had presented evidence that they had applied for U visas, evidence that Mr. Carmona-Hernandez could meet the victim requirement, and evidence specific to Mr. Bante Rivera's risk of deportation—it would have been error and an abuse of discretion to prohibit examination. In light of the speculative nature of the offers of proof, however, the proposed evidence was not highly probative. We find no constitutional error or abuse of discretion in the trial court's decision to exclude the evidence as unduly prejudicial.

II.     LEGAL FINANCIAL OBLIGATIONS (LFOs)

Mr. Quintero also challenges the $200 criminal filing fee and the $100 DNA collection fee imposed at his December 21, 2017 sentencing.

Statutory amendments dealing with LFOs that were made by Engrossed Second Substitute House Bill 1783, 65th Leg., Reg. Sess. (Wash. 2018), effective June 7, 2018, apply prospectively to criminal cases on direct appeal. *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018). Among those changes was an amendment to former RCW 36.18.020(2)(h) (2015) that prohibits the imposition of the $200 criminal filing fee on defendants who are indigent as defined in RCW 10.101.010(3)(a) through (c). The changes also prohibit the assessment of a DNA collection fee if the State has previously collected the defendant's DNA as a result of a prior conviction. RCW 43.43.7541.

Mr. Quintero points out that he has a prior adult felony conviction from 2016, as a result of which his DNA should have been collected. But as observed by this court in

No. 35752-0-III
*State v. Quintero*

*State v. Thibodeaux*, defendants do not always submit to DNA collection despite being ordered to do so. 6 Wn. App. 2d 223, 230, 430 P.3d 700 (2018) (citing *State v. Thornton*, 188 Wn. App. 371, 372, 353 P.3d 642 (2015), *review denied*, 192 Wn.2d 1029, 435 P.3d 278 (2019)). As for the $200 criminal filing fee, the State points out that in its order of indigency for appeal, the trial court found "the Defendant lacks sufficient funds to prosecute an appeal and the applicable law grants the Defendant a right to review at public expense," which employs language from RCW 10.101.010(3)(d), a form of indigency that does not exempt Mr. Quintero from application of the fee. CP at 213. We direct the court on remand to strike the DNA collection fee, subject to the State's opportunity to present evidence that the fee remains mandatory for Mr. Quintero.

We affirm the convictions and remand for proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

18